NOT DESIGNATED FOR PUBLICATION

No. 119,827

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

TIMOTHY WARREN WEBB,
*Appellant*.

MEMORANDUM OPINION

Appeal from Wyandotte District Court; WESLEY K. GRIFFIN, judge. Opinion filed April 24, 2020. Affirmed.

*Kai Tate Mann*, of Kansas Appellate Defender Office, for appellant.

*Kayla Roehler*, assistant district attorney, *Mark A. Dupree Sr.*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before ARNOLD-BURGER, C.J., GREEN and BUSER, JJ.

PER CURIAM: Timothy Warren Webb appeals from his jury conviction of intentional second-degree murder. He argues that his conviction should be reversed and case remanded for a new trial for five reasons: (1) the trial court erred when it overruled his objection to the State's preemptory strike of an African American juror in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986); (2) the trial court erred by allowing multiple hearsay statements by the victim into evidence; (3) the trial court committed judicial misconduct in making certain statements during his trial testimony; (4) the prosecutor committed reversible error while making her closing

1

arguments; and (5) the cumulative effect of the preceding errors require reversal of his conviction. Nevertheless, for the reasons stated later, we reject these arguments. As a result, we affirm Webb's intentional second-degree murder conviction.

Webb and his girlfriend, Sharon Nero, had ongoing relationship problems. On May 29, 2012, in the living room of their shared house, Webb shot Nero four times: twice in the head, once in the back, and once in the lower neck. Nero died because of these injuries. Nero's body was left on a couch, covered with a sheet. Webb fled to Houston, Texas, where he turned himself in to the police a few days later. The State of Kansas charged Webb with first-degree murder of Nero and with felon in possession of a firearm.

Webb decided to be tried by a jury. Although the jury convicted Webb of being a felon in possession of a firearm, it was unable to reach a verdict on his first-degree murder charge. As a result, the State tried Webb again before a jury on his first-degree murder charge.

During his second jury trial, the State alleged that Webb had intentionally murdered Nero because of their ongoing relationship problems. Webb, however, argued that he killed Nero in self-defense.

Highly summarized, the State presented the testimony of several witnesses who had spoken to Nero shortly before her death. To begin with, the State read Patricia Dill's testimony from Webb's first trial into evidence. Dill, who had died since Webb's first trial, was a victim's advocate with the district attorney's office. According to Dill's testimony, she met with Nero to discuss an unrelated matter the day of Nero's death. While working on this unrelated matter, Nero confided in her about her and Webb's relationship troubles. Those problems included Nero's fear of Webb and her desire to make Webb move out. Dill testified that based on Nero's concerns, they discussed if Nero should obtain a protection from abuse (PFA) order against Webb.

2

Stephanie Nero, Nero's daughter-in-law, testified that she spoke to Nero on the phone the evening she died. Stephanie stated that during that phone call, Nero told her that she and Webb "were into it that she was sleeping on the couch. She was tired of [Webb]. [Webb] was a liar, [and] she was tired of [Webb] lying all the time about everything." Stephanie also testified that Nero told her that "[t]here [were] some other issues going on."

Laurie Phillips, Nero's roommate during the last two weeks of her life, testified that Nero and Webb argued all the time. But she stated that she never saw the two physically hurt each other. She then testified that during one argument, she overheard Webb tell Nero that he would kill her if she let other men into the house.

Turning to the evening of Nero's death, Phillips testified that when Webb arrived home from work that evening, Nero and Webb immediately started arguing. She testified that as a result, she asked her boyfriend, Patrick Dockery, if he wanted to go to a local lake so she could get away from Webb and Nero's argument. Phillips testified that Dockery agreed to go to the lake, picking her up from the house around 7 or 7:30 p.m. Phillips then testified that while at the lake, Dockery received a text message from Webb saying that they should not disturb Nero, who was asleep on the couch because she was very tired. Dockery also confirmed that Webb had sent him this text message during his trial testimony.

Next, Phillips testified that she and Dockery returned to the house around 9 or 9:30 p.m. She testified that when they arrived at the house, Webb was waiting on the front porch. She stated that Webb immediately asked to borrow her car, taking her car keys from her hand. Phillips testified that after Webb had driven off in her car, she and Dockery went to her bedroom without disturbing Nero. She testified that she did not know Nero was dead until the next morning when Nero failed to respond to her questions

3

about Webb's location. Phillips stated that when she removed the sheet covering Nero's body, she realized that Nero was cold, stiff, and covered with blood.

Webb, who testified on his own behalf, testified to a different version of events. According to Webb, Nero was mentally unstable. He testified that Nero would frequently argue with him. He further stated that Nero made physical threats against him while holding a knife or a gun. Even so, Webb testified that he and Nero intended to continue their relationship and live with one another for the foreseeable future.

Webb testified that on the night of Nero's death, he, Nero, Phillips, and Dockery decided to go to the lake around 9 p.m. Webb stated that Nero changed her mind about going to the lake shortly before the time to leave. So, he and Nero remained at the house while Phillips and Dockery went to the lake. He testified that during this time, Nero stayed in the downstairs living room and he remained in the upstairs bedroom sleeping. Webb testified that at some point, however, Nero woke him up to investigate a noise outside the house. Webb testified that at this point, Nero handed him her gun for protection while investigating the noise.

Webb then stated that when he found nothing outside, he returned to the upstairs bedroom. Yet, he testified that when he returned to the bedroom upstairs, he discovered the bed was soaking wet. According to Webb, he went downstairs to the living room to confront Nero about the wet bed. But when he confronted Nero, she pepper sprayed his face. Webb stated that as Nero pepper sprayed him, Nero grabbed him by his hair, pulling him forward. He then testified that another unknown person grabbed his arm from behind. Webb testified that he believed Nero and the unknown person who had grabbed his arm intended to kill him. Webb then stated that he remembered he had Nero's gun in his back pants pocket. Webb confirmed that once he freed his arm from the unknown third person's grasp, he grabbed Nero's gun and began "firing wildly." He stated that he continued shooting until Nero released his hair.

4

Webb then stated that after washing the pepper spray off his face, he returned to Nero, who was lying on the living room floor bleeding. Webb did not call emergency services. Instead, Webb testified that he held Nero in his arms, praying and crying with her. He testified that after Nero died, he placed Nero's body on the living room couch, covering her lifeless body with a sheet. According to Webb, he then changed his clothes and waited for Phillips and Dockery to arrive home. He confirmed that he asked to borrow Phillips' car and left as soon as Phillips and Dockery arrived at the house. He then testified that he drove Phillips' car to Houston, Texas, where his mother lived, so he could talk to his mother about what had happened before turning himself in.

At the conclusion of Webb's case, the trial court instructed the jury on first-degree murder, as well as the following lesser included offenses: intentional second-degree murder, reckless second-degree murder, voluntary manslaughter resulting from a sudden quarrel, voluntary manslaughter resulting from an unreasonable belief deadly force was necessary, and involuntary manslaughter. The trial court also instructed the jury on Webb's right to self-defense. The jury, however, rejected Webb's self-defense argument, finding Webb guilty of intentional second-degree murder. Afterwards, the trial court sentenced Webb to a controlling term of 628 months' imprisonment followed by 36 months' postrelease supervision.

Webb timely appeals his intentional second-degree murder conviction.

*Did the Trial Court Err When Denying Webb's* Batson *Challenge?*

Webb argues that the trial court erred when denying his challenge under *Batson*, 476 U.S. 79, to the State's preemptory strike of an African American member of the jury pool. Specifically, Webb complains that the trial court failed to follow *Batson*'s three-step procedure. Webb also complains that the trial court wrongly ignored evidence supporting

5

that the State's reason for striking the disputed jury pool member was pretextual. Based on these errors, Webb argues that this court should reverse his second-degree murder conviction and remand for a new trial.

On the other hand, the State argues that the trial court followed the proper *Batson* procedures. The State then argues that under those procedures, the trial court correctly denied Webb's *Batson* challenge because Webb failed to make a prima facie showing of discrimination. Alternatively, the State argues that the trial court correctly denied Webb's *Batson* challenge because it provided race-neutral reasons for striking the challenged juror.

*Standard of Review*

"Generally, each party may use peremptory strikes—also called peremptory challenges—to reject a certain number of potential jurors without stating a reason." *State v. Gonzalez-Sandoval*, 309 Kan. 113, 114, 431 P.3d 850 (2018). Yet, if a defendant objects to the State's preemptory strike under *Batson*, the trial court must consider if the State engaged in purposeful discrimination by following a three-step procedure. 309 Kan. at 114-15, 121.

First, a defendant "alleging discriminatory selection of the jury must make out a prima facie case of purposeful discrimination under the first step prescribed by *Batson*. The party may establish the prima facie case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Gonzalez-Sandoval*, 309 Kan. 113, Syl. ¶ 3. We exercise unlimited review over the trial court's rulings under this first step. 309 Kan. 113, Syl. ¶ 3. Second, if the defendant established a prima facie case of discriminatory intent, the prosecutor "must come forward with a neutral, nondiscriminatory reason for exercising the peremptory strike." 309 Kan. at 122. The prosecutor's explanation need not be persuasive or even plausible. Instead, the

6

explanation must merely be facially valid to be race neutral. 309 Kan. at 122-23. Because this step hinges on the facial validity of the State's race-neutral reason for striking a juror, we give significant deference to the trial court's credibility determinations when reviewing the trial court's decision under the second *Batson* step. 309 Kan. at 124. Third, if the prosecutor provides a facially valid race-neutral reason for striking the juror, the defendant must establish that this facially valid race-neutral reason was pretextual. 309 Kan. 113, Syl. ¶ 7. "When reviewing this factual determination, [we] accord great deference to the trial court," reviewing the trial court's decision for an abuse of discretion. 309 Kan. 113, Syl. ¶ 7.

*Voir Dire*

To address Webb's *Batson* challenge regarding the prosecutor's preemptory strike of an African American in the jury pool—Juror 26—we must first review what occurred during voir dire.

During voir dire, the prosecutor asked if any of the prospective jurors had relatives in law enforcement. Juror 26 responded that both her father and uncle were detectives with the Kansas City, Kansas, Police Department (KCKPD). The prosecutor then asked Juror 26 if her father's position and uncle's position as detectives would "make it hard for [her] to be fair." Juror 26 answered, "No." Juror 26 also recognized that she could not talk to her father or uncle about Webb's case while sitting on the jury. The only other time Juror 26 spoke during voir dire was when Webb's attorney, Jeffrey Leiker, asked if "anybody . . .[had] specialized knowledge in the medical field . . . ." Juror 26 explained that she worked at a hospital, having previously earned a degree in health management.

Later, the prosecutor struck Juror 26. After striking Juror 26, the prosecutor, Leiker, and the trial court engaged in the following discussion:

7

"MR. LEIKER:  I would ask for race neutral reasons for the State to strike her. She was African American, my client's African American. She indicated during testimony that her father and I believe uncle work for the KCKPD, and that was pretty much the extent of her—at least of the information that she provided. There's some questioning I think by the prosecutor regarding what she could consider and she very accurately pointed out what the law was on that particular point as far as her admonition and what she could talk about with her uncle or father if she were to go home about this particular case. I don't think there was any reason to strike her in this case other than the fact that she is African American and so is my client."

"THE COURT:  According to my understanding of the law, there's a three-step process . . . .

". . . I'm pretty darn convinced that just merely saying that because somebody is black and she was struck—and there's no doubt in the world she's African American, so is Mr. Webb—but seems like there's got to be more than just saying that it's not right.

. . . .

". . . Then looking at State v. Hood, 242 Kan. 115, so back about 30 years ago, to establish purposeful discrimination defendant needs to show only that he or she is a member of a cognizable minority group and the prosecutor's exercised challenges to remove from that group. That to me is very—it doesn't support what the later law is and what the U.S. Supreme Court does. But while I disagree with it, I'm duty bound to follow cases that are 30 years old now so I don't get reversed because of what I think is not the proper standard now.

"So I'm not still convinced that there's been the proper showing. But, State, could you provide a facially valid reason for exercising a peremptory strike, race neutral?

. . . .

"[THE PROSECUTOR]:  . . . I would be happy to explain my reasoning.

"First of all, there are minorities still on this jury panel, particularly African Americans, that weren't struck. The defense struck two African Americans, one male and one female that I would not have struck and I would have allowed to remain on the jury. I only struck three African Americans out of 12, which is not a large number.

. . . .

"[F]inally when it comes down to juror number 26, she was one of my last strikes. I considered keeping her on. She was strike number 11, but she—number one, she's—her—either her uncle or her father is a homicide detective, one of the two I know

8

that, and the other one's a detective. I don't know why I would create an appeal issue by leaving her on the jury.

"Number two, it was her youth. I think she's not married, she doesn't have any kids, she hasn't been—she's been at her job for two years I think, but I would just prefer people who are middle age to older who are married, have kids and have a longer job history. Frankly, I was pretty pleased with this panel as a whole and I was having to, towards the end, pick people that normally I would keep.

"But the next—I've had this happen before too when you get an employee from a DA's office or someone related to stay on the panel and then on appeal they complain about it. I had a case like that in this courtroom. So I also saw it not only because of her age and no children, but I also saw it as an opportunity to possibly prevent an appeal issue.

"THE COURT: [Mr. Leiker], is there anything you would like to add?

"MR. LEIKER: Nothing to add to that, Judge.

"THE COURT: Thank you.

"Well, reading . . . from the Davis case, it talks about that the second step does not demand—and I'm reading from syllabus three—does not demand a prosecutor's explanation that is persuasive or even plausible but merely facially valid.

"Further, unless a discriminatory intent is inherent—and that's the word they use—in the prosecutor's explanation, reason offered will be deemed racially neutral. Accordingly, the ultimate burden of persuasion rests with, never shifts from the opponent of the strike.

"I think that they have provided racially neutral reasons for the sole of number 26. So the record is clear, but that *Batson* objection is overruled."


*No* Batson *Violation*


Webb makes three *Batson* arguments on appeal. First, Webb contends that the trial court failed to follow *Batson*'s three-step procedure. Webb specifically argues that the trial court never determined if he made a prima facie case of purposeful discrimination as required under *Batson*'s first step. Second, Webb argues that the trial court wrongly collapsed *Batson*'s second step and third step. Third, Webb argues that even if the trial

9

court followed *Batson*'s three-step procedure, the State's reason for striking Juror 26 was pretextual, requiring reversal of his conviction and remand for a new trial.

On *Batson*'s first step, Webb argues that the trial court "appeared to eschew this step of the analysis, stating that it was not ruling one way or the other" on Webb's *Batson* challenge. It seems Webb's argument hinges on the trial court's comment that it did not believe Webb's argument in support of a prima facie case of purposeful discrimination was particularly persuasive before it ultimately asked the State to provide a race-neutral reason for striking Juror 26. Although the trial court made this comment about Webb's argument in support of a prima facie case of purposeful discrimination, the record does not support that the trial court eschewed its duty to engage in *Batson*'s first-step analysis.

Instead, when the trial court considered Webb's challenge, it noted that the only reason Webb provided to support that the State engaged in purposeful discrimination was that both he and Juror 26 were African Americans. It explained that it did not believe that the fact he and Juror 26 were African Americans was particularly indicative of the State's purposeful discrimination under recent United States Supreme Court precedent. But it then noted that in *State v. Hood*, 242 Kan. 115, Syl. ¶ 1, 744 P.2d 816 (1987), our Supreme Court held that to "establish a prima facie case of purposeful discrimination, the defendant needs to show only that he or she is a member of a cognizable minority group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of that group." Then, the trial court explained that although it doubted the current correctness of the *Hood* holding given current United States Supreme Court precedent, it would follow the *Hood* holding because it was still valid Kansas Supreme Court precedent.

On that basis, the trial court did not shun its duty to engage in *Batson*'s first-step analysis. To the contrary, the trial court engaged in thoughtful analysis under *Batson*'s first step because it considered the validity of Webb's complaint both under United States

10

Supreme Court precedent and Kansas Supreme Court precedent. Although the trial court noted that it disagreed with our Supreme Court's precedent, it explicitly stated that it was following that precedent because it was duty bound to do so. Simply put, the trial court's comment that it believed that Webb's reason supporting purposeful discrimination was not particularly persuasive, does not mean that the trial court failed to engage in *Batson*'s first-step analysis.

As for Webb's argument that the trial court wrongly combined *Batson*'s second and third steps, Webb contends that the trial court overruled his *Batson* objection because it "simply found that the State had presented race neutral reasons." Webb also compares his case to *State v. Davis*, 37 Kan. App. 2d 650, 659, 155 P.3d 1207 (2007), where this court held the trial court failed to engage in *Batson*'s third step. But in making his arguments, Webb misconstrues the trial court's *Batson* analysis in a couple of ways.

Admittedly, the trial court did not explicitly state that it was engaging in *Batson*'s third-step analysis. Even so, this does not mean that the trial court failed to engage in *Batson*'s third-step analysis. To begin with, immediately after Webb objected under *Batson*, the trial court noted that *Batson* objections have "a three-step process." Thus, although the trial court did not explicitly state what *Batson* step it was engaging in when it conducted its *Batson* analysis, the trial court did explicitly recognize that it needed to consider Webb's *Batson* challenge under *Batson*'s three-step process.

Next, Webb's argument does not consider the entirety of the trial court's analysis when denying his *Batson* challenge. To review, the trial court's reasons for denying Webb's *Batson* challenge included the following: (1) ruling that Webb had established a prima facie case of purpose discrimination because both he and Juror 26 were African American; (2) expressing that although Webb had carried the burden for establishing a prima facie case of discrimination, Webb's reasoning that both he and Juror 26 were African American was not particularly strong evidence of purposeful discrimination; (3)

11

providing the prosecutor an opportunity to give race-neutral explanations for striking Juror 26, which the trial court accepted as facially race neutral; (4) providing Leiker with the opportunity to refute the prosecutor's facially race-neutral reasons for striking Juror 26, which Leiker declined to do; and (5) concluding that "the record [was] clear" that the prosecutor had not violated *Batson* by striking Juror 26. Also, before denying Webb's *Batson* challenge, the trial court emphasized that burden of persuasion always remained on Webb.

Based on the preceding, it is readily apparent that the trial court engaged in each of *Batson*'s three steps. When the trial court ruled that "the record [was] clear" that no *Batson* violation existed, the trial court referred to its previous reasoning that Webb's prima facie showing of purposeful discrimination was weak and the prosecutor's unchallenged facially race-neutral reasons for striking Juror 26. In short, when Leiker declined to argue why the prosecutor's facially race-neutral reasons for striking Juror 26 were pretextual, all that remained was for the trial court to rule on whether Webb had carried his burden of persuasion.

In addition, Webb's comparison of his case to the *Davis* case is misplaced. In that case, the trial court ended its *Batson* analysis after finding that the prosecutor provided facially race-neutral reasons for striking the challenged juror. The trial court in *Davis* even barred the defendant the opportunity to establish that the State's reasons for striking the juror were pretextual. 37 Kan. App. 2d at 656. Thus, this court reversed and remanded for a new *Batson* hearing based on the trial court's failure to engage in *Batson*'s third step. 37 Kan. App. 2d at 661-62.

The trial court here, however, gave Webb the opportunity to establish that the State's reasons for striking Juror 26 were pretextual. Also, although minimal, the trial court engaged in *Batson*'s third-step analysis when it ruled that the "record [was] clear." And, therefore, Webb's case is distinguishable from the *Davis* case. The trial court here

engaged in *Batson*'s third step. On that basis, Webb's argument is fatally flawed and a remand for a new *Batson* hearing is unwarranted.

Finally, on Webb's argument that the prosecutor's given reasons for striking Juror 26 were pretextual, Webb did not make this argument before the trial court. Nevertheless, Webb contends that consideration of his argument is necessary to serve the ends of justice because it involves a violation of his rights under the Fourteenth Amendment to the United States Constitution. See *State v. Phillips*, 299 Kan. 479, 493, 325 P.3d 1095 (2014) (holding that appellate courts may consider arguments raised for the first time on appeal if consideration of the argument is necessary to serve the ends of justice and preserve a fundamental right). Thus, we will consider his argument for the first time on appeal.

In his brief, Webb's argument hinges on the fact that the State did not strike other jurors who were related to police officers or who were young. But neither of the other jurors who stated that they were related to police officers stated that they were related to *two detectives currently serving with the KCKPD*. Webb also ignores that Juror 26 had relatives on the KCKPD *and* she was young. The other jurors who Webb points to either had relatives in the KCKPD or were young, not both. Furthermore, according to an unchallenged statement by the prosecutor before the trial court, one of Juror 26's relatives was a homicide detective. Because Webb was charged with murder in KCKPD's jurisdiction, the prosecutor's argument that she struck Juror 26 to avoid a potential appeal issue seems highly credible.

Most importantly, Webb's argument ignores that in defending her decision to strike Juror 26, the prosecutor explained that seven African Americans remained on the final jury panel. Thus, African Americans made up a majority of Webb's jury. Under *Batson*'s third step, the trial court must make a fact finding on the plausibility of the State's given reasons for striking the juror based on the totality of the circumstances.

13

Because the trial court's finding involves a credibility determination, our review of the trial court's finding is highly deferential. *Gonzalez-Sandoval*, 309 Kan. at 126. Given that a majority of the persons on Webb's final jury panel were African American, no reason exists to doubt the trial court's credibility determination that the State's reasons for striking Juror 26 were not pretextual.

In summary, each of Webb's arguments is unpersuasive. A review of the trial court's reasoning shows that it followed *Batson*'s three-step procedure. Also, the evidence does not support Webb's argument that the prosecutor's stated reasons for striking Juror 26 were pretextual. Thus, Webb's *Batson* challenge fails.

*Did the Trial Court Err by Allowing Inadmissible Hearsay Into Evidence?*

Next, Webb argues that the admission of the following out-of-court statements made by Nero through the trial testimony of others resulted in reversible error:

- Stephanie's testimony that during a phone call the night Nero died, Nero told her "[t]hat [she and Webb] were into it, that she was sleeping on the couch. She was tired of [Webb]. [Webb] was a liar, [and] she was tired of [Webb] lying all the time about everything." Stephanie also testified Nero told her that "[t]here [were] some other issues going on."
- Dill's testimony that Nero told her (1) that she was afraid of Webb, (2) that she wanted Webb to move out; (3) that she was sleeping on the couch; (4) that she was not speaking to Webb; (5) that she was interested in a PFA order against Webb; (6) that Webb would get "would get real agitated" and "explosive"; and (7) that Webb would not allow her grandchildren to visit.
- Phillips' testimony that after she moved into the house, Nero told her that "[Webb] wasn't [going to] be there long or he wasn't supposed to be there."

14

- The first responding officer's testimony that Phillips told him that Nero had told her that "she wanted to get an eviction on [Webb]."
- Dockery's testimony that during an argument with Webb the evening of Nero's death, Nero complained to Webb about Webb not "pulling his part of the relationship," not "hav[ing] a steady job," not helping with "the bills," and not "doing [anything] but drinking."

The State, however, argues that Webb failed to preserve his hearsay arguments for appeal because he did not make contemporaneous or specific objections to the disputed testimony. In the alternative, the State argues that the complained-about testimony was admissible hearsay. And in the alternative to this argument, the State asserts that the admission of the complained-about testimony resulted in harmless error.

*Standard of Review*

This court reviews the trial court's admission of hearsay statements under K.S.A. 2019 Supp. 60-460 for an abuse of discretion. *State v. Jones*, 306 Kan. 948, 957, 398 P.3d 856 (2017). An abuse of discretion occurs if the trial court's ruling was based on an error of fact, an error of law, or an otherwise unreasonable decision. 306 Kan. at 957. "Error in the admission of evidence that does not implicate a defendant's constitutional rights is harmless if there is no reasonable probability the error affected the trial's outcome in light of the entire record." *State v. Chapman*, 306 Kan. 266, 276, 392 P.3d 1285 (2017).

*Preservation*

Under K.S.A. 2019 Supp. 60-460, absent certain statutory exceptions, "[e]vidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated, is hearsay evidence and inadmissible." To preserve a challenge regarding hearsay evidence for appeal, a defendant must make a

contemporaneous objection to the complained-about evidence. This contemporaneous objection must also "make clear the specific ground of objection." K.S.A. 60-404.

Webb contends that his hearsay arguments are properly before this court because he made a continuing objection to the admission of Nero's statements through the testimony of others if that testimony was not being offered to establish Nero's state of mind. On the other hand, the State argues that a continuing objection to hearsay is impermissible because parties must make contemporaneous and specific objections under K.S.A. 60-404. The State relies on *State v. Bollinger*, 302 Kan. 309, 352 P.3d 1003 (2015), to support its arguments.

In *Bollinger*, the State introduced out-of-court statements by the murder victim at trial. On appeal, Bollinger challenged those statements as inadmissible hearsay. But the State, however, maintained that Bollinger failed to preserve his hearsay arguments because he had not lodged contemporaneous and specific objections at trial. At trial, Bollinger had requested a continuing objection to the admission of the murder victim's out-of-court statements, which the trial court "noted." Bollinger, however, never "object[ed] to any specific testimony." 302 Kan. at 323.

Our Supreme Court held that Bollinger's hearsay arguments were not properly preserved for appeal because a continuing objection to hearsay is impermissible:

> "A continuing objection does not operate prospectively to preserve review of unspecified future testimony. See *State v. Miller*, 293 Kan. 535, 553-54, 264 P.3d 461 (2011). This is particularly true in circumstances such as the present case. A continuing objection does not afford the [trial] court a realistic opportunity to know which words in a witness' lengthy testimony are considered objectionable by the defendant. In addition, Bollinger argues on appeal that the district court 'did not consider whether [the murder victim] had motive to lie or incentive to distort.' It is unclear how the district court was supposed to consider that question, when it did not have the particular testimony before it

16

when it declined to exclude any hearsay testimony and when there was no contemporaneous objection at the time of the testimony.

> "The lack of a specific contemporaneous objection to the statements in question precludes us from considering this issue. The continuing objection left wide open which statements Bollinger might later contest. The [trial] court never explicitly ruled on the objection, even if an implicit overruling can be guessed at by the court's decision to 'note' the continuing objection. Bollinger failed to preserve the issue for appeal." 302 Kan. at 323-24.

So, the *Bollinger* case stands for the proposition that a continuing objection to unspecified future testimony will not preserve a party's hearsay argument. Instead, to preserve a hearsay argument for appeal, a party must make a contemporaneous objection regarding specified testimony. On the other hand, Webb argues that the continuing hearsay objection here is far different from the continuing hearsay objection in *Bollinger*. He maintains that because his continuing objection to the statements made by Nero went beyond her alleged state of mind, his case is very different from *Bollinger*.

Because Webb contends that his continuing objection to hearsay preserved his hearsay argument for appeal, we must now review each of Webb's hearsay arguments to determine if he made a contemporaneous objection to specified testimony to preserve his hearsay arguments.

Webb's first hearsay argument involves Stephanie's testimony about what Nero told her during the phone call the night of her death. At trial, Webb lodged his hearsay objection after the State asked Stephanie about the details of this conversation. But the trial court overruled his objection:

> "Q. [By the State]: What did Nero tell you about him, if anything?
> "MR. LEIKER: Judge, objection; hearsay.
> "THE COURT: I'm sorry?
> "MR. LEIKER: Hearsay objection.

"THE COURT: Overruled. This is what the alleged victim in the case said so overruled."

Following Webb's hearsay objection, Stephanie testified that Nero had told her "[t]hat [she and Webb] were into it, that she was sleeping on the couch. She was tired of [Webb]. [Webb] was a liar, [and] she was tired of [Webb] lying all the time about everything." Stephanie also testified that Nero told her that "[t]here [were] some other issues going on." Thus, Webb lodged a contemporaneous hearsay objection to this disputed testimony.

Shortly after making this hearsay objection, however, Webb asked for a sidebar conference. During this sidebar conference, Webb never objected to specific testimony. Instead, Webb asked for a continuing objection to all of Nero's statements admitted into evidence through Stephanie's testimony that did not concern Nero's state of mind.

The State responded that the complained hearsay was similar to the testimony at issue in *State v. Seacat*, 303 Kan. 622, 635, 366 P.3d 208 (2016). In that case, our Supreme Court upheld the trial court's admission of the murder victim's out-of-court statements about Seacat threatening to kill her through the testimony of persons she told about the threats shortly before her death. 303 Kan. at 623, 636-37. The specific statute that the trial court relied on in *Seacat*—K.S.A. 2014 Supp. 60-460(d)(3)—states:

"A statement which the judge finds was made: . . . (3) if the declarant is unavailable as a witness, by the declarant at a time when the matter had been recently perceived by the declarant and while the declarant's recollection was clear and was made in good faith prior to the commencement of the action and with no incentive to falsify or to distort."

The trial court here agreed that the out-of-court statements made by Nero were like those at issue in *Seacat*. Thus, it rejected Webb's argument that the State sought to

18

admit inadmissible hearsay because the hearsay fell under K.S.A. 2019 Supp. 60-460(d)(3)'s exception. It then granted Webb's continuing objection while noting that it was unsure "what an appellate court would do" when considering the continuing objection.

On Webb's second hearsay argument, before the trial court read Dill's testimony from Webb's first trial into evidence, Webb stated that he was "renew[ing] the same hearsay objection [he made during Stephanie's testimony] . . . as to any hearsay that's not related to [Nero's] state of mind . . ." The trial court "noted" Webb's hearsay objection.

In this instance, it is readily apparent that Webb's continuing objection did not preserve his hearsay argument for appeal because his objection mirrors the continuing objection at issue in *Bollinger*. Even with Dill's written testimony before him, Webb failed to specify what statements he took issue with within Dill's testimony. As a result, the trial court necessarily did not know what statements Webb challenged as inadmissible hearsay. For this same reason, the trial court could not rule on Webb's continuing objection in the context of Dill's testimony.

Yet, on appeal, Webb complains that the trial court wrongly admitted Nero's out-of-court statements through Dill's testimony without considering whether Nero had an "incentive to falsify or distort her statements to . . . Dill." Thus, just like in *Bollinger*, Webb sought to have a continuing objection that operated prospectively to preserve review of unspecified statements. Because our Supreme Court determined that this type of objection does not preserve a hearsay argument for appeal, Webb's hearsay arguments concerning Dill's testimony are not properly before us.

As for Webb's third hearsay argument, Webb requested a sidebar conference after Phillips testified that when she moved into the house with Nero, Nero told her that "Webb wasn't [going to] be around long or wasn't supposed to be there." During the

19

sidebar conference, Webb renewed his objection to anything Nero told any of the witnesses assuming Nero's out-of-court statements did not involve her state-of-mind. The trial court recognized Webb's continuing objection to any testimony "about anything that [Nero] allegedly said."

So, Webb seemingly objected to Phillips' testimony about Nero telling her about Webb not "be[ing] around for long" as hearsay testimony not pertaining to Nero's state of mind. But because Webb lodged the objection in the context of his continuing objection, it also seems that the trial court believed that it was not obligated to specifically rule on the objection. As a result, we can infer only the following: (1) that Webb objected to Phillips' testimony because he believed that it involved statements not concerning Nero's state of mind, and (2) that the trial court overruled Webb's hearsay objection because he believed Phillips' testimony about Nero's out-of-court statements was admissible under K.S.A. 2019 Supp. 60-460(d)(3). As to this second point, we can make this inference because when the trial court first overruled Webb's continuing objection during Stephanie's testimony, it relied on our Supreme Court's interpretation of K.S.A. 2014 Supp. 60-460(d)(3) in *Seacat*.

Nevertheless, the need for us to infer exactly what Webb was objecting to and exactly why the trial court overruled that objection is precisely the problem our Supreme Court described in *Bollinger*. Indeed, our Supreme Court recently explained in *State v. Ballou*, 310 Kan. 591, 614, 448 P.3d 479 (2019), that the contemporaneous objection rule exists so "the district court [has] the opportunity to make the ruling contemporaneous with an attempt to introduce evidence at trial." In short, by making a continuing objection instead of a contemporaneous objection to Phillips' testimony, we must guess why Webb objected and why the trial court overruled that objection. Thus, Webb's objection was neither contemporaneous nor specific as required under K.S.A. 2019 Supp. 60-404. For that reason, Webb's hearsay argument about Phillips' testimony is not properly before this court.

Also, even if Webb's hearsay argument about Phillips' testimony was properly before us, Phillips' testimony was admissible as an exception to the hearsay rule. For example, the ongoing hostility between Nero and Webb was very relevant to the murder charge and the self-defense claim. On that basis, Nero's statement ("Webb wasn't [going to] be around long or wasn't supposed to be there") was offered to show Nero's hostility towards Webb. Thus, it was circumstantial evidence of Nero's state of mind. K.S.A. 60-460(1)(l).

Next, Webb objected to the testimony of the first responding officer, Officer Chris Bussell, about what Phillips had told him about what Nero had told her concerning Nero and Webb's relationship. When he objected, Webb asserted that his objection differed from his continuing objection because Officer Bussell's testimony involved double hearsay. The State responded that Officer Bussell's testimony was admissible because Webb had the ability to cross-examine Phillips at trial. The trial court agreed, overruling Webb's objection. Officer Bussell then testified that Phillips had told him "that [Nero] wanted to get an eviction on [Webb]."

Because he did not rely on his continuing objection, Webb has preserved his hearsay argument about Officer Bussell's testimony for appeal. And, therefore, we will consider Webb's hearsay argument about Officer Bussell's testimony.

Finally, in his brief, Webb challenges Dockery's testimony that Nero believed that he was unhelpful, unemployed, and often drunk. Nevertheless, Webb admits that he did not make a contemporaneous objection to Dockery's testimony. Instead, he contends that he preserved his hearsay argument about Dockery's testimony through his continuing hearsay objection. As discussed at length earlier, however, our Supreme Court has held that "[a] continuing objection does not operate prospectively to preserve review of

21

unspecified future testimony." *Bollinger*, 302 Kan. 309, Syl. ¶ 9. And so Webb's hearsay argument about Dockery's testimony is not properly before this court.

In short, Webb has made numerous hearsay arguments on appeal, contending that he preserved those arguments through a continuing objection. But our Supreme Court's holding in *Bollinger* shows that hearsay arguments are not preserved through continuing objections because such objections do not operate prospectively to preserve review of unspecified testimony. To this end, only two of Webb's hearsay arguments are properly before this court: (1) his argument concerning Stephanie's testimony about Nero's statements during their phone call, and (2) his argument about Officer Bussell's testimony concerning double hearsay.

*Remaining Hearsay Arguments Are Unpersuasive*

Once more, Webb challenges Stephanie's testimony about Nero telling her "[t]hat [she and Webb] were into it, that she was sleeping on the couch. She was tired of [Webb]. [Webb] was a liar, [and] she was tired of [Webb] lying all the time about everything." He also challenges Stephanie's testimony that Nero told her that "[t]here [were] some other issues going on." But during trial, Webb confirmed that he and Nero were arguing frequently. He testified that Nero made physical threats against him while holding a knife or a gun. He also testified that Nero believed that he was cheating on her. Yet, he denied cheating on her. Moreover, Phillips testified to the same preceding facts as did Stephanie: that Webb was sleeping upstairs in the bedroom while Nero was sleeping downstairs on the living room couch. Nevertheless, Webb never lodged an objection to Phillips' testimony.

Thus, Webb's and Phillips' testimony established that Webb and Nero were often arguing, that Nero was sleeping on the couch, and that Nero believed Webb was lying to her about cheating. In turn, Stephanie's challenged testimony about Webb and Nero's

22

ongoing arguments, about Nero sleeping on the couch, and about Nero believing Webb was lying were very similar to the facts Webb introduced through his own testimony at trial. Because Webb affirmatively relied on those alleged hearsay statements of Nero in support of his self-dense claim to the murder charge, we conclude that he has waived any objection to Stephanie's testimony. See *State v. Perez*, 306 Kan. 655, 666, 396 P.3d 78 (2017) (holding that when a defendant challenges the admission of evidence that is cumulative of other admissible evidence, the admission of the challenged evidence is harmless beyond a reasonable doubt).

In addition, Stephanie's testimony about Nero's statements to her that Webb, to coin a phrase, is a "lousy person," shows an act of hostility towards him. And this would be circumstantial evidence of Nero's state of mind, and not hearsay.

Next, Webb's argument about Officer Bussell's testimony is similarly flawed. For starters, although Webb objected to Officer Bussell's testimony as double hearsay, Phillips testified at Webb's trial. K.S.A. 2019 Supp. 60-460(a) permits hearsay testimony if it involves "[a] statement previously made by a person who is present at the hearing and available for cross-examination . . . ." Thus, the portion of Officer Bussell's testimony involving Phillips' statement was admissible.

On Nero's portion of the disputed statement, Webb, objected to Officer Bussell's testimony that Phillips had told him that Nero had told her that she wanted to evict Webb. Yet, at trial, Dockery also testified that he heard Nero tell Webb that she wanted him to leave the house. Webb however, did not object to this testimony. Thus, any error resulting from the admission of Officer Bussell's testimony was harmless because it was cumulative. Also, Bussell's testimony about Nero's statements to Phillips was circumstantial evidence of Nero's state of mind, not hearsay.

All in all, Webb's hearsay arguments fail.

23

*Did the Trial Judge Commit Judicial Comment Error?*

Next, Webb argues that the trial judge committed judicial comment error by making certain statements during his trial testimony in the presence of the jury and outside the presence of the jury. Webb maintains that the trial judge's hostility toward him and Leiker was so evident that it resulted in prejudice requiring reversal of his intentional second-degree murder conviction.

On the other hand, the State argues that nothing in the record shows that the trial judge treated Webb unfairly. The State also argues that nothing in the record supports that the trial judge was displeased with Webb or his testimony. Instead, the State responds that the complained-about comments involved the trial judge "attempting to maintain order [in the] courtroom."

*Standard of Review*

An appellate court has unlimited review over claims of judicial comment error. *State v. Boothby*, 310 Kan. 619, 624, 448 P.3d 416 (2019). If a defendant establishes that the judge made an erroneous comment in front of the jury, an appellate court reviews the erroneous comment under the constitutional harmless error test. As a result, after the defendant establishes judicial comment error, the burden shifts to the State to prove beyond a reasonable doubt that the erroneous comment did not affect the trial's outcome when viewed in light of the entire record. 310 Kan. at 625.

*Disputed Judicial Comments*

To fully understand the judicial comments Webb complains about, we must first consider the context of those judicial comments.

24

Webb gave multiple narrative responses during his direct examination. Upon the State's first objection to Webb's narrative response, Webb interrupted the trial judge's ruling. And so the following discussion occurred before the jury:

"THE COURT: Just a second.

"[WEBB]: How am I [going to] explain?

"THE COURT: Just a second. Okay, you have an attorney. He knows his job, he's very good at it. He will ask a question. When you say what is today, you can't go on—

"[WEBB]: Okay.

"THE COURT: —for an hour and-a-half. There's a question, answer the question.

"[WEBB]: Okay.

"THE COURT: Is today Wednesday? Well, on the other day I did—no, okay.

"[WEBB]: Okay.

"THE COURT: That's what we're getting at.

"[WEBB]: I'm sorry.

"THE COURT: I have all faith in [Leiker] that he's going to be able to ask you all the questions he wants.

"[WEBB]: Thank you.

"THE COURT: Okay.

"MR. LEIKER: Thank you, Judge."

Following this discussion, Leiker continued to ask Webb questions. Webb also continued to provide narrative responses. Eventually, the State again objected to Webb's testimony as narrative. The trial judge agreed that Webb's responses were narrative, telling Leiker "please, counsel, help." The trial judge and Webb then had the following exchange before the jury:

25

"THE COURT:  And, Mr. Webb, you can't just—if there's a general question, you can't just go until you're tired, okay. You have to rely on the questions that your attorney [. . .]

"[WEBB]:  So he [has] to ask me every time for each time?

"THE COURT:  Yeah.

"[WEBB]:  Okay . . ."

Shortly after this exchange, Leiker asked Webb if he had met Nero's daughter. Webb responded that he had met Nero's daughter Theresa but not Nero's daughter Nicki. Then, without an additional question, Webb started explaining why he had not met Nicki. The State objected as to relevance. Leiker explained that he believed Webb's testimony about why Nicki had not met Webb was relevant because of Nicki's previous testimony during the State's case that she did not approve of Webb. At this point, the State requested a sidebar conference. The trial judge responded, "Sure. I didn't think that was Nicki [who testified earlier]." Webb then interjected that Nicki was a nickname for Dominique. Dominique had, in fact, testified earlier in Webb's trial.

When the sidebar conference outside of the presence of the jury started, the trial judge stated, "If he does this every time, we're [going to] take a recess and stop this shit. Like he corrected me [about Nicki's name] right then." Next, the State maintained that Nicki's real reason for not approving of Webb was his registered sex offender status. The State asserted that although the trial judge had previously barred it from eliciting testimony about Webb's registered sex offender status, if Webb provided some alternative explanation why he had not met Nicki, Webb opened the door to discuss his registered sex offender status. Leiker then asked the trial judge for guidance about what questions he could ask Webb without opening the door to Webb's registered sex offender status, during which the following discussion occurred:

"MR. LEIKER:  All right. Well, I don't know, I'm almost to the point where I guess I need some sort of preliminary instruction as to what the judge wants me

26

to do. I'm going to ask him a question, this is not a secret, you've seen him testify before. And I think the judge understands that he is going to get animated and he—and I'm going to do my best to control him and stop him after he makes a point, but I think he has to be able to give some sort of answer to the question. I'm not asking him 'yes' or '"no' questions. He has to be able to give an explanation. His explanations are a little bit more wordy[,] and I'm going to do my best to try to control him.

"THE COURT:  That's all I can ask you to do, but then you say, well, tell us about that incident and he goes that was one and then and then and then. That's what he can't just keep volunteering until he's exhausted.

"MR. LEIKER:  Well, no, I can appreciate that, but I—

"THE COURT:  And I will not allow him to yell. If he gets animated—and he's done that the whole time—but I will not allow him to scream and yell with the microphone right in front of him that amplifies it.

"MR. LEIKER:  Do you want to—

"THE COURT:  I've told him that. You heard me tell him that. I also told him he couldn't approach the jury.

"MR. LEIKER:  No, I can appreciate that. . . .

. . . .

"THE COURT:  I can't sit here and say, well, if you ask this question, he gives an answer because Lord knows I don't know what answer he's [going to] give to anything.

"MR. LEIKER:  Well, I guess I can—I can appreciate that. But I—at this particular point I guess there's two things that we probably need to make sure that everybody is clear on before we break here. One, does the judge feel like you need to give him some sort of instruction outside the presence of the jury as to how to continue? I've been mindful that he is rambling on a little bit and—

"THE COURT:  A little bit?

"MR. LEIKER:  Well, look, I would have said something immediately after both of you had jumped up and just beat me to the punch. So I had intended on stopping him at both the same time that you guys objected or you intervened. This is something I'm very mindful of, something we had expected, but I cannot control him—

"THE COURT:  I understand.

"MR. LEIKER:  —other than tell him to stop.

"THE COURT: That's why I've told him he can't yell. I mean his answers are okay, I don't have any problem with his answers, it's just that he keeps going and going and going.

"MR. LEIKER: The yelling I don't know what we can do about.

"THE COURT: Well, I will admonish him every time he yells.

"MR. LEIKER: Well, I'd prefer that if there's going to be any admonishment that—

"THE COURT: It's going to be, Mr. Webb, you cannot yell, something like that.

"MR. LEIKER: Okay.

"THE COURT: You said you were going to go back and tell him about this, about my rules.

"MR. LEIKER: Okay. I did.

"THE COURT: Okay.

"[THE STATE]: I believe you.

"MR. LEIKER: I don't—actually I correct myself, I'm not sure that we had a discussion about him yelling. I was a little startled myself when he did it. But in any event, if the court's comfortable, we can continue and I can just assure you that if he does start going on, I mean you guys are welcome to intervene whenever you want, but I—

"THE COURT: I anticipate just tell him and I will break in if he starts yelling and say, Mr. Webb, don't yell, things like that. If it's any worse than that, I'll clear the jury.

"MR. LEIKER: Okay. Well, the only other thing is I guess what is the judge's ruling on [the State's relevance objection]? Is the court going to allow the State to get into his criminal history if he comments on testimony that came in yesterday?

. . . .

"THE COURT: Didn't I say I don't know what the answer's going to be and I don't know what the response is going to be? You have to be very careful. There's some cases the defendant can hardly open the door for his prior record and other crimes. So I'm mindful of that, but he's a loose cannon. I have no idea what he's going to say. There could be a lot of things that may come in that would never ever come in without his responses. I don't know.

"MR. LEIKER: So I guess as far as relevance, the only thing that he was [going to] comment on a second ago was testimony he heard yesterday that was about him that

28

was negative, and that is essentially the only relevance to it. He's cleaning up what he heard yesterday that he believes is false, that's it.

"THE COURT: If he can keep it to a minor situation and not a five-minute dissertation, which he's prone to do, I'm [going to] give him some leeway. He's a defendant, he has a right to tell his side, but we can't go farfetched on every little tangent that he wants to talk about.

"MR. LEIKER: No, I can appreciate that. . . .

. . . .

"[THE STATE]: And we'll see what happens about opening the door when it happens.

"MR. LEIKER: I mean is that a threat? Because again, I would like to get some sort of preliminary ruling on that.

"THE COURT: I can't, [Mr. Leiker].

. . . .

". . . Are we going to go through the 20 possibilities of his answers? That's [why] I cannot and I will not give an answer. I'm not going to give a ruling with this and that and this and that and this and that because I have no clue what this man's going to say."

After this discussion, Leiker went on with Webb's direct examination. Webb's direct examination continued uninterrupted for some time until the State objected to a question about if Nero was hospitalized for mental health issues:

"Q. [By Mr. Leiker] Did she ever go into the hospital with mental health issues to your knowledge?

"A. [Webb]: From my understanding—well, I did talk to her myself before she—

"[THE STATE]: Objection to relevance.

"THE COURT: Stop, stop, stop. [H]is understanding doesn't cut it.

"[WEBB]: Okay.

"THE COURT: You asked specific—just a second. You asked the right question. You have to answer the question—

"[WEBB]: Yes.

"THE COURT: —not what your understanding is.

"[WEBB]: Okay.

29

"THE COURT: He asked you if you knew, not the world.

"[WEBB]: Yes.

"THE COURT: Go ahead.

"[WEBB]: Yes.

"THE COURT: No, Mr. Leiker, go ahead with your question. Repeat it if you need to.

"Q. (By Mr. Leiker): Was she hospitalized?

"A. [Webb] Yes.

"Q. And that was for mental health issues?

"A. Yes.

"Q. And that was recently or sometime ago?

"A. It was before my time.

"Q. Okay.

"[THE STATE]: So I object and ask that that be struck from the record. That's what you just told him if he didn't—

"MR. LEIKER: Judge, and I would—

"[THE STATE]: And I object to the relevance of that even.

"THE COURT: I do too. Move on.

"MR. LEIKER: Okay.

"A. [By Webb]: She told me.

"Q. (By Mr. Leiker): Was there—

"THE COURT: Okay, I'm sorry. We're [going to] take a break."

At this point, the trial judge held a conference with the parties, including Webb, outside the presence of the jury:

"THE COURT: We're still on the record. Mr. Webb's still on the witness stand. So in other words, he is present. All attorneys are present, jury is not. Mr. Webb.

"[WEBB]: Yes.

"THE COURT: When I say that you can't get into something, you do not then respond but she told me. You did that, didn't you?

"[WEBB]: Uh-huh.

30

"THE COURT: I told your attorney that something was improper, to move on and you then blurted out so the jury could hear but she told me. You simply cannot do this. You may not like this, Mr. Webb, but you don't run this show.

"[WEBB]: I know, Your Honor.

"THE COURT: No, I don't think you do because twice now you have kept going when I have told you to move on, you have gone on yourself. You did not listen to your attorney. He asked—remember when I said question, answer? Last one was question, four answers, and that's just the last dang question. If you want to testify, and I know you do and I allowed you to testify in the last trial.

"[WEBB]: Yes. And I apologize the last trial I kept talking.

"THE COURT: And you're [going to] apologize again. Mr. Webb, you cannot do that.

"[WEBB]: Just answer, tell what happened, but I have to be careful.

"THE COURT: But there were some things that I told the State they couldn't bring up.

"[WEBB]: Uh-huh.

"THE COURT: There are things I'm going to tell your attorney and you[,] you can't bring up. So everything that you desire to talk about may not be relevant.

"[WEBB]: Yes, sir.

"THE COURT: And may not be allowed.

"[WEBB]: Yes, sir.

"THE COURT: So you either keep that in mind or you're [going to] lose the ability to testify.

"[WEBB]: Okay.

"THE COURT: And that's an extreme consequence, but I am not going to allow when I tell your attorney to move on that you go ahead and respond to the answer—with the answer to that question like you did twice now.

"[WEBB]: I apologize. Yes.

"THE COURT: Well, apologize is cheap. Control yourself.

"[WEBB]: Okay.

"THE COURT: And again, you haven't done it again, but if you yell, I'm [going to] every time I'm [going to] break in and tell you to tone it down.

"[WEBB]: Okay. My voice carries so much.

"THE COURT: Don't yell. Don't yell, okay.

31

"[WEBB]:  Okay.

"THE COURT:  I do that to attorneys.

"[WEBB]:  I probably don't need the microphone. My voice carries so loud.

"THE COURT:  I don't think you do, but some people do. . . ."

After this exchange, the trial judge asked Leiker to talk to Webb privately about not answering questions after the objection to the question had been sustained. Leiker and Webb had a private conversation. Then, Leiker continued his direct examination of Webb before the jury. Webb's direct examination continued uninterrupted until Leiker asked Webb about what he had been doing the day of Nero's death. Webb responded that his and Nero's problems started two days before her death. He then started explaining that they hosted a barbecue for Phillips and Dockery two days before Nero's death. After providing this answer, Leiker asked Webb, "So what were you doing that day?" The following then occurred:

"A. [By Webb]:  Me and my girlfriend barbecued and cooked other things and side to go with it. When Laurie came in that evening, I called Patrick and she had already talked about meeting somebody so I called Patrick and told Patrick to come and meet my roommate. And he came down and I told him I'm barbecuing, come have something to eat and everything. So they met, we all enjoyed the rest of the evening that day. We took Patrick home, I took him home I believe, and that was the end of that day. Me and my girl, we made love, went to bed.

"[THE STATE]:  So I'm going to object then. The question was let's talk about the day in question. Mr. Webb says no, it started two days before that and then we just got this story that has no relevance.

"THE COURT:  I agree. What's the relevance to that situation that was bad?

"MR. LEIKER:  Well, I'm sorry, Judge, maybe I don't understand the objection. He was done with the answer, I was going to ask him a question about moving forward.

"THE COURT:  You talked about what started that day and then he said, oh, it started two days ago and that seemed like a nice story.

"MR. LEIKER:  I agree.

"THE COURT:  Okay. Well, let's move on then.

32

"MR. LEIKER: Okay.

"Q. [By Mr. Leiker]: So that particular day of the holiday weekend was fine, the two of you were on good terms like boyfriend and girlfriend?

"A. [By Webb]: Yes.

"Q. All right. So when did things—I'm sorry, let's move forward to the day of the actual incident. What were you doing that morning?

"A. I would have to consult with the judge because when I said that led up to two days, the stuff, it started—it started on the day before, that's when we first started getting along bad is what she did. So it would not just be—

"THE COURT: Mr. Leiker, Mr. Leiker, Mr. Leiker, please. Mr. Webb is once again answering questions not proffered or when I tell you to move on, he is proffering stuff himself. This could result in a lack of being able to testify. Please ask questions. Mr. Webb, please answer the questions. And to be honest, you really can't consult with me. I'm not—that's your attorney. The State's going to be able to ask you questions, but I'm not in the question, answer or consultation business.

"[WEBB]: Uh-huh.

"THE COURT: Mr. Leiker, please next question."

After this exchange, Webb completed his direct examination without interruption. During cross-examination, however, Leiker took issue with the State's questioning. At which point, the following happened:

"Q. [By the State]: Weren't you worried about that other person who was in there at that point?

"A. [By Webb]: At that point I wasn't worried about the other person at all. I didn't even much think about the other person. All I did was reach and grab for her. And another thing, the light, I'm glad you asked me that because I wouldn't have seen her if the other person hadn't cut the light on up in the entryway because the light is the only thing [going to] shine up in there let me see her.

"MR. LEIKER: Judge, can we approach.

"A. [By Webb]: [Because] other than that, it was dark.

"MR. LEIKER: Can we approach, Judge?

"THE COURT: In the middle of a question, yeah, and his answer?

33

"MR. LEIKER: Objection then.

"THE COURT: Oh, okay. Now, that makes sense.

"(Thereupon, the following proceedings were had at the bench by court and counsel out of the hearing of the jury.)

"THE COURT: Objection, see, when you said may we approach, that was in the middle of his question—his answer.

"MR. LEIKER: Well, I guess—

"THE COURT: Answer that is just going on and on and on and on.

"MR. LEIKER: Which is exactly my objection. I was held to a standard when I was questioning him if he went on and on. The prosecutor stood up, the judge intervened and stopped him from doing it. Now the same thing's happening when the prosecutor's asking him questions and she's not being held to the same standard to keep control of the witness and answer the questions that are being asked.

"THE COURT: Did you control your guy?

"MR. LEIKER: We did the best that we could. There's not being any attempts right now to stop him.

"THE COURT: I will do so. I understand what you're saying, I do, but he's not yelling mostly, he's not answering other questions mostly and that's what he was doing with some of you. He would—you would ask him tell me about that instance and then he'd talk about 10 instances.

"MR. LEIKER: Judge, just a second ago he was testifying and I think she asked him a question and he started to answer it and then he segued to another question by saying and I'm glad you asked me that because by the way, here's this other thing, and he started to answer that question. And so—

"THE COURT: So you want me to stop him and when he gets mad and answers, okay. I understand what you want.

"MR. LEIKER: I'm just asking that the prosecutor try and control him and ask him—

"THE COURT: No, no. Why do we put the responsibility of somebody else to control your client?

"MR. LEIKER: I'll object when he's not responsive I guess to the questions.

"THE COURT: Okay.

"[THE STATE]: It's what you're supposed to do.

"MR. LEIKER: Well, I mean I—

34

"THE COURT: But that's not the job of her to control your client I don't think.

"MR. LEIKER: Well, I think she has to control the witness. I have no control over him. He's my client. When I'm questioning the witness, no matter whose witness it is, I try to[] keep control of the situation. In this particular case I would expect the prosecutor to keep control of the situation as well.

"THE COURT: I understand."

After the preceding discussion, the State's cross-examination of Webb continued without further interruption.

*No Judicial Misconduct*

When deciding if the trial judge committed judicial comment error, an appellate judge must consider the trial judge's comment "on a case-by-case basis, always informed by existing caselaw concerning when judicial comments fall outside a permissible latitude." *Boothby*, 310 Kan. at 627. An appellate judge must also pay particular attention to the facts and circumstances surrounding the alleged comment error. *State v. Hayden*, 281 Kan. 112, 116, 130 P.3d 24 (2006). In other words, the existence of judicial comment error must be determined by the context of the challenged comment.

Our Supreme Court has explained that to avoid judicial comment error, trial judges must do the following:

"The judge should endeavor to conduct the trial in an atmosphere of impartiality and, therefore, should refrain from remarks or conduct that may injure a party. The judge should be the exemplar of dignity and impartiality, should exercise restraint over personal conduct and statements, should avoid personal predilections, and should control personal emotions. The judge should not permit any person in the courtroom to embroil him or her in conflict. The judge should avoid behavior that tends to demean the proceedings or to undermine the judge's authority. When it becomes necessary during the trial to comment upon the conduct of witnesses, spectators, counsel, or others, or upon the testimony, those

35

comments should be made in a firm, dignified, and restrained manner, avoiding repartee. The judge's comments and rulings should be limited to what is reasonably required for the orderly progress of the trial and should refrain from unnecessary disparagement of persons or issues." *State v. Miller*, 308 Kan. 1119, 1154-55, 427 P.3d 907 (2018).

Even so, the "[m]ere possibility of prejudice from a judge's remark is not sufficient to overturn a verdict or judgment." *State v. Miller*, 274 Kan. 113, 118, 49 P.3d 458 (2002). In fact, "[if] the judge's comments can be construed properly and reasonably, rendering them unobjectionable, the remarks will not be regarded as prejudicial." *State v. Gaither*, 283 Kan. 671, 682, 156 P.3d 602 (2007).

Webb here contends that he did not receive a fair trial based on the trial judge's comments to him and to Leiker both in the presence of the jury and outside the presence of the jury. He essentially alleges that the trial judge's statements showed a bias against him that polluted his trial and prejudiced the jury against him. Yet, Webb's argument ignores the limited scope and context of the trial judge's comments.

To begin with, the trial judge's first and second challenged comments, which happened in the presence of the jury, helped Webb. When Webb openly complained about the State's narrative objection, the trial judge told him to rely on Leiker because he was a "very good" attorney. The judge then tried to explain to Webb how to respond to questions without giving narrative responses. The trial judge's next comment had the same sentiment. After the State objected to Webb's continuing narrative responses, the trial judge asked Leiker to "please, counsel, help." The judge then instructed Webb again about how to respond to questions without giving narrative responses.

In short, nothing about those two comments by the trial judge in the presence of the jury were errant. Indeed, the trial judge complemented Leiker as an attorney. If anything, the trial judge's comments conveyed to the jury that he approved of Leiker. The

36

trial judge's remaining comments involved helping Webb answer Leiker's questions in an unobjectionable way. Therefore, a reasonable interpretation of the trial judge's comments shows nothing discourteous or prejudicial towards Webb.

Undeniably, the trial judge's interactions with Webb and Leiker intensified from this point. Yet, it is readily apparent that the trial judge's interactions intensified for reasons of the following: (1) because Webb violated the trial judge's orders, and (2) because Leiker repeatedly asked the trial judge to rule on issues either he had previously refused to rule on or he had previously denied. When challenging the trial judge's comments, Webb seems to take the trial judge's comments out of this context.

For starters, when challenging the trial judge's comment that "[i]f he does this every time, were [going to] take a recess and stop this shit," Webb contends that this comment showed the judge's displeasure and contempt with his testimony. Nevertheless, the trial judge was not showing any displeasure or contempt with Webb's testimony in general. Instead, the trial court's comment was directed at Webb's decision to correct him in the presence of the jury about Nicki being Dominique's nickname. Although the trial judge's language was inappropriate, the comment was made outside of the jury's presence. Thus, the comment had no prejudicial effect because the jury never heard it.

Next, Webb argues that the following comments by the trial judge showed the trial judge's displeasure and contempt with his testimony: (1) the trial judge's comment that he needed to respond only to the question Leiker asked and "not the world," and (2) the trial judge's comment that he was not "run[ning] this show." Yet, when complaining about these comments, Webb ignores that this was his fourth admonishment by the trial judge to not give narrative answers. Clearly, at this point, the trial judge realized that Webb was ignoring his instructions. In turn, a more serious reprimand was warranted by the trial judge.

37

Additionally, the trial judge made the comment about Webb not "run[ning] this show" in response to Webb's decision to answer a question that the judge explicitly instructed him not to answer. And just like Webb's previous challenged comment, the trial judge made this comment outside the jury's presence. Because the judge made the "not run[ning] this show" comment outside the presence of the jury, no prejudice stemmed from that comment.

Also, the record shows that when the trial judge made the preceding disputed comments, the trial judge was actively trying to maintain jury impartiality. After Webb answered the question that he was not supposed to answer, the trial judge ordered a break so he could discuss Webb's behavior outside the presence of the jury. During the break, the trial judge took the opportunity to instruct Webb once again as to what he could and could not do while testifying. Although there is no direct evidence in the record regarding the trial judge's tone and demeanor when making the preceding disputed comments, we note that the trial judge admonished Webb outside the jury's presence. Thus, we determine that the trial judge was actively striving to maintain his impartiality before the jury.

Besides, Webb's complaints about the trial judge's comments are comparable to the complaints rejected by the Tenth Circuit Court of Appeals in *United States v. Deters*, 184 F.3d 1253, 1256 (10th Cir. 1999). In that case, Deters challenged several of the trial judge's comments throughout her trial. The challenged comments included the trial judge's decision to interrupt witnesses' testimony. At one point, the trial judge told a witness that he had heard enough about a certain subject unless the witness had something to add that the past four witnesses had not testified about. At another point, the trial judge told a witness not to volunteer answers. Deters argued that the trial judge's comments expressed the judge's partiality against her to the jury. But the Tenth Circuit Court of Appeals disagreed. It held that "[t]he court's interruptions and comments as to

the . . . two witnesses were appropriate—the testimony being offered was clearly cumulative, irrelevant, based on hearsay, or non-responsive." 184 F.3d at 1257.

So, the *Deters* case stands for the proposition that so long as the trial judge's interjections do not convey partiality, a trial judge may interject during witness testimony to prevent objectionable testimony. As addressed earlier, in this case, the trial judge here made the complained-about comments (1) to ensure Webb followed his orders and (2) to ensure that Webb did not provide objectionable responses. Thus, based on the *Deter* case's persuasive authority, the trial judge here did not err in making these instructive comments to Webb.

Finally, Webb argues that the trial judge's interaction with Leiker during the State's cross-examination established that the trial judge was hostile and combative. Webb particularly takes issue with the trial judge's comment asking Leiker if he "control[led] [his] guy." Nevertheless, under a reasonable interpretation of the trial judge's comment, the comment was inoffensive.

At the disputed conference, which was outside of the jury's presence, Leiker wanted the trial judge to ensure that the State "controlled" Webb's testimony since the judge had asked him to control Webb's direct-examination testimony. The trial judge responded to Leiker's request in two ways: First, the trial judge explained that he would intervene when necessary. Even so, the trial judge continued by explaining that so far, he had not intervened during the State's cross-examination because Webb was mostly not yelling and was generally not providing narrative responses. The trial judge then explained that Webb's answers were comparable to "what [Webb] was doing with some of [Leiker's questions during direct-examination]." Second, the trial judge told Leiker that it was ultimately his duty to control Webb since Webb was his client.

39

On appeal, Webb does not challenge the appropriateness of the trial judge's ruling. Yet, even if the trial judge erred by declining Leiker's request to make the State control Webb's testimony, an erroneous ruling alone does not establish judicial comment error. Only manifest bias and prejudice establishes such error. *State v. Kahler*, 307 Kan. 374, 384, 410 P.3d 105 (2018), *cert. granted* 139 S. Ct. 1318 (2019). Nothing in the record indicates that the trial judge was rude to Leiker when making his comments. Instead, a reasonable interpretation of the trial judge's comment when considered in context shows that the trial judge was simply trying to explain why he would not accept Leiker's request to make the State control Webb.

Also, once again, the trial judge made the disputed comments about controlling Webb outside of the jury's presence. And because the trial judge made the comments outside the jury's presence, no prejudice resulted from those comments.

Thus, to summarize, when considered in context, the trial judge's comments were proper and reasonable. And, therefore, we reject Webb's arguments that the trial judge engaged in judicial comment error.

*Did the Prosecutor Commit Error During Closing Arguments?*

Next, Webb argues that the prosecutor committed error on three separate occasions during her closing arguments:  First, he argues that the prosecutor committed error when she described his lesser included offenses of voluntary manslaughter as "intentional crime[s]." Webb contends that this comment misstated the law because voluntary manslaughter requires a defendant to "knowingly" kill the victim, not "intentionally" kill the victim. Second, he argues that the prosecutor committed error when she stated that neither the State nor the experts could tell the jury exactly where Nero was located when she was shot because Webb moved items around the crime scene. Webb argues that this statement improperly shifted the burden of proof onto him because

the State "impl[ied] that [he] was responsible for the lack of evidence regarding where . . . Nero was shot." Third, Webb argues that the prosecutor committed error when she stated that "[t]here [was] no evidence that [the pepper spray] was used at all in the house and no one smelled anything, whether it be police officers, whether it be civilians." Webb contends that this comment misstated the facts in evidence because he testified that Nero had pepper sprayed his face during their argument.

The State concedes that the culpable mental state for voluntary manslaughter is "knowingly" not "intentionally." But it argues that this error did not prejudice Webb because the prosecutor increased the State's burden of proof. The State then argues that a review of the entirety of the prosecutor's statements establishes that she did not shift the burden of proof onto Webb or misstate facts in evidence. Alternatively, the State contends that any error resulting from the prosecutor's comments was harmless.

*Standard of Review*

This court reviews claims of prosecutorial error in a two-step process:

"To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman* [*v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)]. In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, i.e., where there is no reasonable possibility that the error contributed to the verdict.' [Citation omitted.]" *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

41

*No Prosecutorial Error*

Each of Webb's prosecutorial error arguments are unpersuasive. First, the parties agree that Webb's lesser included offenses of voluntary manslaughter under K.S.A. 2019 Supp. 21-5404(a)(1)—killing another human being upon a sudden quarrel—and voluntary manslaughter under K.S.A. 2019 Supp. 21-5404(a)(2)—killing another human being upon an unreasonable but honest belief that deadly force was necessary—both included "knowingly" as the requisite culpable mental state. Thus, the prosecutor technically misstated the law during closing arguments when she described both types of voluntary manslaughter as "intentional" crimes. Even so, the State correctly argues that there is no reasonable possibility that this technical misstatement of law affected the jury's verdict.

The trial court here instructed the jury that Webb must have "knowingly" committed his lesser included offenses of voluntary manslaughter under K.S.A. 2019 Supp. 21-5404(a)(1) and (a)(2). As a result, the trial court's jury instructions corrected this error. Additionally, K.S.A. 2019 Supp. 21-5202(c) states that "proof of a higher degree of culpability than that charged constitutes proof of the culpability charged." "Intentionally" is the highest culpable mental state needed to commit a crime in Kansas. Meanwhile, "knowingly" is the second highest culpable mental state needed to commit a crime in Kansas. And so the prosecutor actually increased the State's burden of proof when she stated that Webb's lesser included offenses of voluntary manslaughter must be committed "intentionally" instead of "knowingly."

Second, Webb asserts that the prosecutor told the jury it could "hold the lack of evidence of the State's case against him" by telling the jury the following:

> "We can't tell you exactly where she was when she was shot. The experts can't
> tell you, they've come in here and they've told you that. Part of the reason for that is this

42

defendant altered the crime scene, he moved things. That's his fault, not the State's. But we can't tell you exactly where she is. You don't have to know that. Don't let anyone make you think you do. We know enough from the evidence in this case as to what happened."

Yet, Webb's argument ignores the evidence presented at his trial.

At trial, Webb testified that he shot Nero near a vent in the living room. Webb's blood stain expert conceded that Nero may have been shot by the vent. Still, the blood stain expert also testified that if Nero was shot near the vent, she would expect more blood to be located around the vent given the extent of Nero's injuries. Thus, the evidence indicating where Nero was located when she was shot was unclear. On the crime scene, Webb testified that after shooting Nero, he "picked her up," "h[eld] her," placed her on the couch, and then covered her with a sheet. He then testified that he went upstairs and changed his clothes. With that in mind, the trial evidence shows that Webb altered the crime scene after shooting Nero because he moved her body and other items around the crime scene.

And so when the prosecutor stated that the experts did not know exactly where Nero was located when Webb shot her, she correctly summarized the evidence. Also, the prosecutor correctly summarized the evidence when she stated that Webb had altered the crime scene. It is a well-known rule that "a prosecutor may draw reasonable inferences from the evidence and is allowed considerable latitude in discussing the evidence." *State v. Corbett*, 281 Kan. 294, 312, 130 P.3d 1179 (2006). Indeed, Webb's decision to move Nero's body after shooting her hampered the expert's ability to determine where Nero was located when she was shot. Thus, when she made her comment, the prosecutor was not burden shifting. If anything, she was providing an explanation why the State could not present evidence as to Nero's exact location when she was shot.

Webb's final argument also ignores the context of the prosecutor's statement. Our Supreme Court has previously held that when reviewing a prosecutor's statement for error, an appellate court must consider the prosecutor's statement in context of his or her entire closing argument. *State v. Cosby*, 293 Kan. 121, Syl. ¶ 5, 262 P.3d 285 (2011). For instance, in *Cosby*, our Supreme Court determined that the prosecutor's statement, which the defendant challenged as burden shifting, fell within the wide latitude afforded to prosecutors because in addition to the disputed statement, the prosecutor emphasized that the State had the burden of proof during his closing argument. 293 Kan. at 136. Here, during her closing argument, the prosecutor explicitly told the jury that "[t]he State's burden of proof never shifts so keep that straight here. [Webb] doesn't have to prove anything. I still have the entire burden right here." And so, like in *Cosby*, the prosecutor's disputed statement when considered in the context of her entire closing argument undermines any contention that the prosecutor sought to burden shift.

Third, Webb challenges the prosecutor's statement that "[t]here [was] no evidence that [the pepper spray] was used at all in the house . . . ." Webb contends that when making this statement, the prosecutor never "even acknowledge[d his] testimony" about Nero escalating their altercation by pepper spraying him in the face. With that in mind, according to Webb, the prosecutor misstated the evidence. Nevertheless, Webb's argument ignores that the prosecutor explicitly recognized Webb's testimony about Nero pepper spraying him in the face.

When stating that there was no evidence that anyone used pepper spray in the house, the prosecutor first noted that none of the witnesses had testified that they smelled anything strange to indicate the pepper spray's use. She then noted that the police ultimately found a can of pepper spray under the couch upon which Webb placed Nero's body. Next, the prosecutor stated that even if the jury accepted Webb's testimony about Nero pepper spraying his face, it seemed unlikely that Nero, who suffered from asthma, would have been able to place the pepper spray can under the couch.

44

Again, "a prosecutor may draw reasonable inferences from the evidence and is allowed considerable latitude in discussing the evidence." *Corbett*, 281 Kan. at 312. And when determining if a statement fell within the wide latitude afforded to prosecutors, we must look at the prosecutor's statement in context. *Cosby*, 293 Kan. 121, Syl. ¶ 5. When the prosecutor's statement is read in context of her surrounding statements, it is clear that the prosecutor here did not misstate the evidence. Instead, she challenged Webb's testimony that Nero escalated their altercation by using pepper spray. She then pointed to the evidence indicating that pepper spray was not used in the house. Because the prosecutor explicitly recognized Webb's testimony that Nero sprayed him with pepper spray in the context of making this argument, Webb's argument that the prosecutor misstated the facts in evidence is fatally flawed.

*Did Cumulative Error Prejudice Webb's Trial?*

Finally, Webb argues that if the errors resulting from his preceding arguments do not individually require reversal of his intentional second-degree murder conviction, this court must reverse his conviction based on the cumulative effect of those errors.

When considering if cumulative error exists, an appellate court examines the errors in context of the entire record. An appellate court must address the nature and number of the errors, as well as the relationship between each of the errors. Moreover, an appellate court must consider the overall strength of the evidence supporting the defendant's conviction. *State v. Holt*, 300 Kan. 985, 1007, 336 P.3d 312 (2014).

Despite Webb's argument to the contrary, the trial court here did not err when it denied Webb's *Batson* challenge and when it allowed the admission of Nero's statements through Stephanie's and Officer Bussell's testimony. In addition, the trial judge did not commit judicial comment error. The only error the prosecutor committed during closing

45

arguments was harmless beyond a reasonable doubt because the prosecutor increased the burden of proof on the State when stating that Webb's lesser included voluntary manslaughter offenses were "intentional crimes." Because a single error cannot support reversal under the cumulative error doctrine, Webb's argument fails. *State v. Gonzalez*, 307 Kan. 575, 598, 412 P.3d 968 (2018).

Affirmed.