IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 110,945

STATE OF KANSAS,
*Appellee*,

v.

BRENT BOLLINGER,
*Appellant.*

SYLLABUS BY THE COURT

1.

By amending the arson statute in 1969, the legislature intended to expand the types of property interests subject to protection.

2.

It is an essential element of the crime of arson that a party other than the defendant have an interest in the property damaged by fire.

3.

The State is not required to establish the exact nature of "any interest" in order to satisfy the statutory requirement for arson. The State is required only to establish that the damaged property is a dwelling in which a person other than the defendant has an interest and that the property was damaged without the consent of the other person.

4.

A spouse has a sufficient, cognizable legal interest in a shared residence to satisfy the requirement of the arson statute that a person other than the defendant has an interest

1

in property. This interest is derived from a variety of sources, including statutory inchoate rights and permissive leaseholds.

5.

The arson statute does not require that a defendant have actual knowledge of someone else's interest in the property.

6.

It is difficult for a challenger to succeed in persuading a court that a statute is facially unconstitutional. Such challenges are disfavored, because they may rest on speculation, may be contrary to the fundamental principle of judicial restraint, and may threaten to undermine the democratic process. It is easier for a challenger to succeed in persuading a court that a statute is unconstitutional as applied to that particular challenger.

7.

When discussing the evidence presented at trial, a prosecutor may ask a jury to draw reasonable inferences from the evidence.

8.

A party must make a specific contemporaneous objection to the admission of evidence or testimony at trial; otherwise, the issue of the admission of that evidence or testimony is not preserved for appeal.

9.

A continuing objection does not operate prospectively to preserve review of unspecified future testimony.

Appeal from Bourbon District Court; MARK WARD, judge. Opinion filed June 26, 2015. Affirmed.

*Kurt P. Kerns*, of Ariagno, Kerns, Mank & White, LLC, of Wichita, argued the cause, and *Melanie S. Morgan*, Morgan Pilate LLC, of Kansas City, Missouri, was with him on the brief for appellant.

*Natalie Chalmers*, assistant solicitor general, argued the cause, and *Derek Schmidt*, attorney general, was with her on the brief for appellee.

The opinion of the court was delivered by

ROSEN, J.  Brent Allan Bollinger appeals from his convictions by a jury of felony murder, aggravated arson, and aggravated child endangerment. We find no error in the proceedings below and affirm the convictions.

The defendant Brent Bollinger (Bollinger) married the victim, Brenna Stewart Bollinger (Brenna), in March 2009. They lived together at 2166 Grand Road, Fort Scott, in a house that Bollinger bought in August 2008. Brenna had a son from a previous relationship who was 3 years old at the time and whom Bollinger adopted. The couple subsequently had a son together, Bryson, who was born in September 2009.

During the short duration of the marriage, the couple experienced considerable trouble in their relationship. Brenna filed for divorce in June 2010, but she subsequently reconciled with Bollinger. Despite the reconciliation, however, Bollinger and Brenna continued to drift apart.

In mid-October 2011, the marital relationship grew significantly more contentious. On Saturday, October 8, in anticipation of seeking a divorce, Brenna went to a bank to

withdraw money to pay for a lawyer. Bollinger encountered her at the bank, and the two quarreled about the money. That same day, while Brenna was away from the house, Bollinger broke furniture that Brenna's grandmother had given her, smashed a television set with his fist, and took some of Brenna's clothing out of the house and burned it in the backyard. A friend later overheard a telephone conversation in which Brenna shouted at Bollinger, "I don't care, Brent, just burn the damn house, burn the race car, I don't care, I don't care anymore."

On Tuesday, October 11, Brenna informed Bollinger that she intended to obtain a divorce. The next day, she filed for divorce and obtained temporary ex parte orders, which included a provision for her continued residency at the house while she sought alternate living quarters. She did not have process served on Bollinger; instead, she told him that he should pick the papers up because she wanted to avoid an ordeal for the children.

The following evening, Thursday, October 13, 2011, a fire occurred at the house. The couple's older son was away from the house, spending the night with Brenna's mother. The other son, Bryson, was in the home, as was Brenna. Bollinger arrived at the house at around 10 p.m., shortly before the fire began. Brenna was in an upstairs bedroom on her cell phone, but Bollinger interrupted the conversation when he entered the room and said, "What the fuck are you doing, bitch?" Brenna screamed and the phone went dead.

Gasoline was used as an accelerant in the fire. Bollinger would later testify that Brenna and he were alone in Bryson's bedroom when the fire began and he could not remember how the fire started.

Bollinger called 911 on a cell phone and, in a short and difficult-to-understand conversation, reported that his house was burning and his son was inside. He gave the dispatcher what sounded like a different address—2166 Maple Road—from that of the home, and he did not mention that Brenna was in the house. He subsequently drove to his grandmother's house with Bryson and, about 7 minutes later, called 911 from her land line. In that call, he correctly identified the address of the house and informed the dispatcher that his wife was in the house and she had no way of getting out.

Emergency personnel arrived at the burning house and found Bollinger standing in the yard, severely burned, especially on his upper torso. He screamed that Brenna was still in the house. He explained to emergency workers that the fire started after he lit a cigarette, igniting gasoline that had spilled on his shirt while he was cutting firewood. He told emergency workers that he was responsible for the fire. Bollinger's pockets contained the couple's two wedding rings, Brenna's driver's license, and some loose change.

Fire personnel entering the house were unable to reach Brenna before she died. An autopsy revealed that she was still breathing after the fire began. Injuries on her neck were consistent with strangulation. Bollinger was hospitalized for approximately 7 weeks following the fire and received a half-dozen skin graft surgeries. Bryson also suffered severe burns in the fire.

On January 25, 2012, the State filed a complaint\information charging Bollinger with one count of first-degree premeditated murder or, in the alternative, felony murder; one count of aggravated arson, in which a mortgagee's interest in the house was alleged; and one count of aggravated child endangerment. The State filed amended complaints, in which it alleged that Brenna was a party purported to have an interest in the house.

5

At trial, Bollinger testified on his own behalf. He explained that he arrived home the night of the fire, entered the house, and started up the stairs to the bedrooms, where he passed Bryson, who was going down the stairs. Bollinger heard Brenna talking in Bryson's bedroom, so he turned at the top of the stairs and walked into that room, where he saw her talking on her telephone. He said to her, "What the fuck are you doing, bitch?" He was then somehow splashed with a liquid that smelled of gasoline. He lunged at Brenna but could not remember what happened next. After an indeterminate time, he became aware that he was lying on the floor, with his head next to Brenna's prone body. The room was in flames, and Bryson was standing at the foot of his bed, screaming.

Bollinger kicked the glass out of a window and dropped Bryson out onto the ground, before jumping out the window himself. He picked up Bryson and carried him to the garage. Bollinger next called 911 as he returned to the house to rescue Brenna, which he was unable to accomplish because of the heat from the fire. He could not remember when he himself was burned. He returned to the garage to get Bryson and drove him to Bollinger's grandmother's house, where he again called 911.

The jury convicted Bollinger of one count of felony murder, one count of aggravated arson, and one count of aggravated child endangerment. The district court sentenced him to consecutive terms of life, 61 months, and 7 months for the three crimes. Bollinger took a timely appeal to this court.

*Sufficiency of the Evidence*

Bollinger initially argues that the State failed to present sufficient evidence to sustain a conviction under the arson statute.

K.S.A. 2014 Supp. 21-5812(a)(1)(A) defines arson as "[k]nowingly, by means of fire or explosive damaging any building or property which . . . [i]s a dwelling in which another person has *any interest* without the consent of such other person; . . . ." (Emphasis added.) Subsection (b)(1) defines aggravated arson as arson "[c]ommitted upon a building or property in which there is a human being."

Bollinger contends on appeal that the State failed to produce evidence proving that Brenna had "any interest" in the house, an essential element of the crime of arson. In determining whether the State has produced sufficient evidence to sustain a conviction, this court reviews all the evidence in the light most favorable to the prosecution and determines whether it is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Longoria*, 301 Kan. 489, Syl. ¶ 30, 343 P.3d 1128 (2015).

At common law, arson was "the malicious burning of the house of another." *State v. Ross*, 77 Kan. 341, 343, 94 Pac. 270 (1908). The common-law requirement that the property belong to another person was predicated on the assumption that one always has the legal right to destroy one's own property in any manner that one chooses. See Black's Law Dictionary 132-33 (10th ed. 2014) (citing 1 Encyclopedia of Crime and Justice 80, 80 [Sanford H. Kadish ed., 1983]).

As the Missouri Court of Appeals has explained, this element was necessary; otherwise, "a farmer could never rid his land of an old building by burning it without being guilty of arson, nor could landowners allow old houses to be burned for fire department training." *State v. Maxson*, 755 S.W.2d 277, 281 (Mo. App. 1988).

Kansas has codified the prohibition against committing arson for over a century. Older versions of the arson statutes distinguished between fires set during the day and

7

those set at night and defined the crime to include setting fire to a building in which some human being was located. See, *e.g.*, R. S. 1923, 21-501-512. Later versions of the law spoke of the willful burning of "property of another person." See, *e.g.*, G.S. 1935, 21-581 (Corrick). The statutory phrase "property of another person" was strictly construed to mean a fee estate. *State v. Parrish*, 205 Kan. 33, 36, 468 P.2d 150 (1970). The *Parrish* court concluded that merely "some interest" by another party in the property was insufficient to establish the statutory crime of arson. 205 Kan. at 36.

In 1969, the legislature amended the arson statute. The amendment changed the requirement that the property be "the house of another" or "the property of another person." The new statute allowed "any interest" by another to preclude at-will burning of one's own property in 1969. L. 1969, ch. 180, secs. 21-3718, 21-3719. By amending the arson statute the legislature intended to expand the types of property interests subject to protection by the arson statutes. *State v. Boone*, 277 Kan. 208, 214, 83 P.3d 195 (2004).

It is an essential element of the crime of arson that another party have an interest in the subject property. *State v. Christendon*, 205 Kan. 28, Syl. ¶ 1, 468 P.2d 153 (1970). This court has held that the State is not required to establish exactly what the nature of the "any interest" is, be it a fee simple, a rental, or a tenancy, in order to satisfy the statutory requirement. *Boone*, 277 Kan. at 215. "All that is required is for the State to establish that the property damaged is a dwelling in which another person has any interest, and was damaged without the consent of the other person." 277 Kan. at 215.

In *State v. Crosby*, 182 Kan. 677, 683-84, 324 P.2d 197 (1958), this court held that the status of being a mortgage holder did not confer a property interest sufficient to satisfy the requirement of the arson statute at that time that the property be "the property of another person." Then, in *State v. Houck*, 240 Kan. 130, 135, 727 P.2d 460 (1986), despite the legislative intention of expanding the range of protected property interests,

8

this court used the rationale of *Crosby* to conclude that the modern version of the statute also does not include the interest of a mortgagee or an insurance company as "any interest" in real property for purposes of the arson statutes.

Before trial, the State amended the aggravated arson charge to aver that Brenna was the "other" party having the interest, and that was the content of the charge at the time of trial. Bollinger argues that the house that he set on fire was solely his own property and that the State failed to prove that Brenna had an interest in the house. Because he brought the house into the marriage with him and had never transferred ownership to Brenna, he maintains, the essential element of an interest of another is fatally lacking.

Despite the vigor with which Bollinger asserts this issue, Brenna had a sufficient, cognizable legal interest in the house to satisfy the statutory requirement and that evidence of this interest was presented to the jury. This interest was derived both from the legal rights inherent in a marital relationship and the special circumstances of this case.

From the outset, it is clear that in most marital relationships, and, in particular in the Bollingers' relationship, the parties allow each other to reside in a shared residence. Bollinger sought no recourse to have her evicted from what he now deems to have been his exclusive property.

This court has held that a leasehold interest suffices to establish "any interest" for purposes of the arson statutes. *Boone*, 277 Kan. at 214. A leasehold includes a tenancy at sufferance. *Boone*, 277 Kan. at 214 (quoting Black's Law Dictionary 890 [6th ed. 1990]). "Sufferance" is "[t]oleration; passive consent." Black's Law Dictionary 1474 (8th ed. 2004). It is undisputed that Bollinger tolerated or gave passive consent to Brenna's

9

continued residence at the house, and this residence on her part suffices to satisfy the statutory element of her having an interest in the property.

In addition, the probate code provides that one spouse holds an inchoate interest in any property belonging to the other spouse. K.S.A. 59-505 states that a surviving spouse is entitled to one-half of all real estate that the decedent possessed at any time during the marriage. This court has held that the spouse's interest in the real property becomes enforceable upon marriage and remains enforceable during the spouse's lifetime. *Jackson v. Lee*, 193 Kan. 40, 43, 392 P.2d 92 (1964); *Ogg v. Ogg*, 122 Kan. 244, 249, 252 Pac. 205 (1927). Brenna therefore held an enforceable probate property interest in the house up to the time that she died.

A further inchoate interest accrued to Brenna when she filed for divorce. K.S.A. 2014 Supp. 23-2801 mandates that "[a]ll property owned by married persons" shall become marital property, and "[e]ach spouse has a common ownership in marital property which vests at the time of the commencement of such [divorce] action." Although Brenna had not yet served Bollinger with process before her death, she had commenced the action, and this court will not endorse the cynical conclusion that a party may validly avoid service of process and the commencement of an action by killing the opposing party.

When Brenna filed for divorce, the district court entered ex parte temporary orders. The orders decreed, *inter alia*, that

> "until Petitioner is able to locate alternative suitable housing for her and the children, the Petitioner shall be granted temporary exclusive possession of the martial [*sic*] residence located at 2166 Grand Rd., Fort Scott, Kansas . . . . During the time that Petitioner is residing in the marital home, she shall be responsible for payment of all utilities and Respondent shall be responsible for payment of any mortgage on the real property.

10

Respondent shall immediately vacate the premises at 2166 Grand Road, Fort Scott,

Kansas upon service of this Order, . . . . Respondent shall not re-enter the premises during

the pendency of this matter . . . ."

Although Bollinger claims that the temporary orders were no longer in effect because Brenna had made arrangements to obtain an apartment, the record does not show when the apartment would become available to her. She paid a security deposit, but there is no indication that the new dwelling was immediately open, that she had a key to it, or that it was "suitable" for her and the children. While Brenna had not yet served the temporary orders on Bollinger, he was aware that she had filed for divorce. Temporary ex parte orders issued without proper service may be valid so long as they are of short duration. See *U.S.D. No. 503 v. McKinney*, 236 Kan. 224, 231-32, 689 P.2d 860 (1984) (quoting *Carroll v. Princess Anne*, 393 U.S. 175, 180, 89 S. Ct. 347, 21 L. Ed. 2d 325 [1968]). Brenna was granted by court order "exclusive possession" of the house, which is a property interest.

Bollinger contends that he did not have notice of all of the various interests that Brenna held in his house and that due process precludes prosecution. The arson statute contains no notice requirement, and this court has held that the statute does not require that a defendant have actual knowledge of someone else's interest in the property. See *State v. Rodriguez*, 269 Kan. 633, 636, 8 P.3d 712 (2000) (State not required to prove defendant knew identities of individuals having property interest); see also *State v. Watson*, 256 Kan. 396, 399-400, 885 P.2d 1226 (1994) (aggravated burglary conviction does not require proof that defendant had knowledge that building was occupied). Furthermore, Bollinger knew that he was married, that his wife had filed for divorce, and that his wife was residing in the house with his consent. No due process rights to notice were violated by the prosecution.

11

As noted above, this court has held that a jury does not have to specify the nature of the other person's property interest. *Boone*, 277 Kan. at 215. Whether a particular interest qualifies as an interest to support an arson conviction is a question of law. The jury had before it evidence sufficing to support a factual determination from which the legal conclusion could be drawn that Bollinger set fire to property in which another person had a legal interest.

*Constitutionality of the Arson Statute*

Bollinger next argues that the "any interest" statutory element of arson is unconstitutionally vague because interests may be so attenuated as to be nonsensical and because this court has already held that certain interests, such as a mortgage-holder's interest, do not satisfy the statutory requirement. By using the phrase "any interest," Bollinger argues, the statute creates the possibility of a statutory interpretation that would preclude almost any burning of property.

Whether a statute is constitutional is a question of law subject to unlimited review. *State v. McCaslin*, 291 Kan. 697, 730, 245 P.3d 1030 (2011). This court presumes that statutes are constitutional and resolves all doubts in favor of passing constitutional muster. If there is any reasonable way to construe a statute as constitutionally valid, this court has both the authority and duty to engage in such a construction. *State v. Seward*, 296 Kan. 979, 981, 297 P.3d 272 (2013).

A statute is unconstitutionally vague if it fails to give adequate warning of the proscribed conduct, that is to say, that it "'fails to provide a person of ordinary intelligence fair notice of what is prohibited.'" *State v. McCune*, 299 Kan. 1216, 1235, 330 P.3d 1107 (2014) (quoting *United States v. Williams*, 553 U.S. 285, 304, 128 S. Ct. 1830, 170 L. Ed. 2d 650 [2009]). A statute is also unconstitutionally vague if it fails to

12

protect against arbitrary enforcement. *Steffes v. City of Lawrence*, 284 Kan. 380, 389, 160 P.3d 843 (2007). Violation of either aspect of these predictability requirements is grounds for invalidating a statute. *City of Lincoln Center v. Farmway Co-Op, Inc.*, 298 Kan. 540, 545, 316 P.3d 707 (2013).

Thus, the test to determine whether a criminal statute is so vague as to be unconstitutional entails two related inquiries: (1) whether the statute gives fair warning to those potentially subject to it, and (2) whether it adequately guards against arbitrary and unreasonable enforcement. *City of Wichita v. Wallace*, 246 Kan. 253, 259, 788 P.2d 270 (1990). "At its heart the test for vagueness is a commonsense determination of fundamental fairness." *State v. Kirby*, 222 Kan. 1, 4, 563 P.2d 408 (1977).

It is difficult for a challenger to succeed in persuading a court that a statute is facially unconstitutional. Such challenges are disfavored, because they may rest on speculation, may be contrary to the fundamental principle of judicial restraint, and may threaten to undermine the democratic process. It is easier for a challenger to succeed in persuading a court that a statute is unconstitutional as applied to that particular challenger. *Farmway*, 298 Kan. at 548 (citing *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450-51, 128 S. Ct. 1184, 170 L. Ed. 2d 151 [2008]). Therefore we look at whether the statute was unconstitutional as it was applied to Bollinger.

The Kansas arson statutes have not been subject to constitutional challenges based on asserted vagueness. Two other state courts have addressed similar challenges and have upheld their state statutory schemes.

The Kansas arson statute is derived from the Illinois criminal code. See *State v. Johnson*, 12 Kan. App. 2d 239, 242, 738 P.2d 872 (1987) (cited with approval in *Boone*,

13

277 Kan. at 214). In *People v. Ross*, 41 Ill. 2d 445, 244 N.E.2d 608 (1968), the Illinois Supreme Court considered a vagueness challenge to its arson statute. The Illinois criminal code defines "property 'of another'" as "a building or other property, whether real or personal, in which a person other than the offender has an interest which the offender has no authority to defeat or impair, even though the offender may also have an interest in the building or property." Ill. Comp. Stat. ch. 720, 5/20-1 (2015).

The defendants argued that the statutory phrase "a building or property of another" was "so ambiguous and so susceptible of a variety of meanings as to lack the constitutional precision and exactness required in a criminal statute." 41 Ill. 2d at 448. After stating the standards for evaluating the constitutional requirements of specificity, the Illinois court concluded that "any person of ordinary intelligence has fair notice what conduct the statute proscribes. The statement that one knowingly causing damage by fire to a building whereby the interest therein of any other person, without his consent, is defeated or impaired constitutes a crime is not ambiguous, vague or indefinite." 41 Ill. 2d at 448.

The Colorado Supreme Court considered a vagueness challenge to the phrase "an ownership interest in land" in a false representation statute. The court concluded that the term was not, at least in the context of a false representation made to another, "so vague or uncertain that persons of ordinary intelligence must guess as to its meaning or necessarily differ as to its application." *People v. Alexander*, 663 P.2d 1024, 1028 (Colo. 1983). The court declined to decide whether the statute had the potential for unconstitutional vagueness, noting that it was not necessary to determine what, if any, the exact contours of the phrase encompassed because the defendant clearly fit within the central focus of the statutory language. 663 P.2d at 1028 fn.4.

14

Applying the statutory language to Bollinger and his marital situation, as opposed to applying the statute to an abstract defendant, the proscribed conduct does not lie in some fuzzy realm of speculation. A reasonable interpretation of the statutory phrase "any interest" implies an assertable legal interest in property. The Kansas arson statute is sufficiently clear as to inform Bollinger that setting fire to the house in which his wife was residing would constitute arson, and the resulting prosecution did not constitute an arbitrary and discriminatory enforcement of the statute against him.

*The Prosecutor's Closing Argument*

During closing argument, the prosecutor said to the jury:

"You've heard the first 911 call in this case. I submit that you can hear screaming on that phone call. It's up for you to listen and for you to decide what you hear. It's up for you to decide, is it the defendant? Is it Bryson? Or does it sound like, help me, followed by some sort of movement or a struggle?

"What we do know is that the call is disconnected by the caller shortly after. We're going to play State's Exhibit 2 for you.

"(Exhibit No. 2 was played for the Court and Jury.)

"When you go back to the jury room, I'm asking you to consider whether that scream is consistent with Bryson crying on the second call. I'm asking you to consider whether that screaming is consistent with the defendant yelling on the 911 call. You know there were only three people in that house and you as a jury needs [*sic*] to determine what that scream sounds like to you.

"(Exhibit No. 2 was played for the Court and Jury.)

15

"If you, as a jury, believe that that's Brenna Bollinger crying for help on the 911 call, the defendant's story can't be true. The defendant knew that Brenna was alive when he made that call and he knew that she was alive when he started the fire. Based on the evidence that's been presented, the defendant planned and executed the murder of his wife on October 13th of 2011, and I ask you to find him guilty as charged."

Bollinger contends that the comment constituted prosecutorial misconduct by commenting on a fact not in evidence.

In determining whether a prosecutor committed reversible misconduct, this court first decides whether the challenged comment exceeded the wide latitude of language and manner afforded the prosecutor when discussing the evidence. If the comment was outside these bounds, this court next decides whether the comment constitutes reversible error. Reversible error occurs when the statements show ill will by the prosecutor or are so gross and flagrant that they prejudice the jury against the defendant and deny the defendant a fair trial. *State v. Schumacher*, 298 Kan. 1059, 1069-70, 322 P.3d 1016 (2014); *State v. Brown*, 295 Kan. 181, 210, 284 P.3d 977 (2012).

When a prosecutor argues facts that are not in evidence, the first prong of the prosecutorial misconduct test is met. *State v. King*, 288 Kan. 333, 351, 204 P.3d 585 (2009); *State v. Ly*, 277 Kan. 386, Syl. ¶ 4, 85 P.3d 1200, *cert. denied* 541 U.S. 1090 (2004).

A review of the prosecutor's argument in the present case, when considered in its totality, reveals that the prosecutor did not argue facts not in evidence. Upon the 911 dispatcher asking if there is a fire, an indistinct sound is heard that subjectively sounds like someone calling out, "Help me!" It is followed by other indistinct sounds, and Bollinger stops responding to questions from the dispatcher.

16

The prosecutor invited the jury to listen to the recording and speculate on what was being said and by whom the sounds were made. Although the State did not introduce expert testimony to the effect that the sound actually was Brenna calling out "Help me!", the jury could use ordinary experience to decide what, if anything, was being said and whether the additional sounds were signs of a struggle. Bollinger explicitly testified that Brenna and he were the only two people in the room when the fire started and that Bryson was the only other person in the house. The prosecutor suggested that the jury reach its own conclusions about the relevance of the background sounds.

This scenario is comparable to that in *Schumacher*, where a prosecutor asked the jury to draw inferences from background clicking sounds that sounded like the sound of a gun being cocked. This court held that the prosecutor's statement neither reached a scientific conclusion nor was a comment on facts not in evidence. 298 Kan. at 1072. The court concluded that "the prosecutor here simply asked the jury to compare the sound heard in the courtroom with the sound on the video. Further, the prosecutor reminded the jury it could 'decide what that sound [on the video] is.'" 298 Kan. at 1072.

When discussing the evidence presented at trial, a prosecutor may ask a jury to draw reasonable inferences from the evidence. *State v. Chanthaseng*, 293 Kan. 140, 146, 261 P.3d 889 (2011); *State v. Duong*, 292 Kan. 824, 830, 257 P.3d 309 (2011). A prosecutor's statements during closing arguments must be placed in context and may summarize conclusions to which an assessment of the evidence could lead the jury. *State v. Stone*, 291 Kan. 13, 20, 237 P.3d 1229 (2010).

The prosecutor did not belabor the assertion that the jury could reasonably conclude that Brenna could be heard screaming in the background, and the identity of the screaming person would not have been critical for the conviction. The prosecutor simply

17

asked the jury to listen to the tape and reach a decision about what it was hearing. The prosecutor did not act improperly, and we find no error here.

*The Admission of Out-of-Court Statements*

The State introduced evidence of several out-of-court statements that Brenna made in the days leading up to the fire. Bollinger argues on appeal that the admission of these statements constituted reversible error. The State responds that he failed to raise objections to the statements that would preserve the issue on appeal.

A party must make a specific contemporaneous objection to the admission of evidence or testimony at trial; otherwise, the admission of that evidence or testimony is not preserved for appeal. K.S.A. 60-404; *State v. Gaona*, 293 Kan. 930, 954, 270 P.3d 1165 (2012).

Although Bollinger asserts that he objected to the introduction of hearsay statements in a pretrial motion, the objection was not to the statements admitted at trial. In a pretrial filing, the State moved to introduce certain out-of-court statements indicating Brenna's state of mind, including statements to friends and family, text messages, and e-mail exchanges. Bollinger filed a brief response, objecting that he would not be able to adequately explain his position on those statements until they were introduced, because he did not know what the content of the statements would be. It does not appear from the record on appeal that the motion and objection were ever ruled on; instead, the district court pointed to K.S.A. 2014 Supp. 60-460(d)(3) as possible grounds on which the State might rely for admitting Brenna's out-of-court statements. The court then stated that objections to hearsay would be handled during the trial.

At trial, after Julie Norris testified with no objection and before Leslie Godden and Ganette Davidson were called as witnesses, Bollinger's counsel stated, "Judge, I hope – I don't know if the record reflects it but I want to note for the record a continuing objection to the hearsay statements." The court replied, "That's noted on the record, Mr. Morrison." He did not object to any specific testimony.

A continuing objection does not operate prospectively to preserve review of unspecified future testimony. See *State v. Miller*, 293 Kan. 535, 553-54, 264 P.3d 461 (2011). This is particularly true in circumstances such as the present case. A continuing objection does not afford the district court a realistic opportunity to know which words in a witness' lengthy testimony are considered objectionable by the defendant. In addition, Bollinger argues on appeal that the district court "did not consider whether Brenna had motive to lie or incentive to distort." It is unclear how the district court was supposed to consider that question, when it did not have the particular testimony before it when it declined to exclude any hearsay testimony and when there was no contemporaneous objection at the time of the testimony.

The lack of a specific contemporaneous objection to the statements in question precludes us from considering this issue. The continuing objection left wide open which statements Bollinger might later contest. The district court never explicitly ruled on the objection, even if an implicit overruling can be guessed at by the court's decision to "note" the continuing objection. Bollinger failed to preserve the issue for appeal.

*Cumulative Error*

Bollinger argues that, even if none of the asserted errors were so prejudicial when considered individually, they collectively denied him a fair trial. When this court finds that no errors were committed, the cumulative error doctrine does not apply. *State v.*

*Lowrance*, 298 Kan. 274, 298, 312 P.3d 328 (2013). Having found no error in the conduct of the trial, we reject the assertion of cumulative error.

*Conclusion*

The State presented sufficient evidence to sustain a conviction of arson, and the arson statute under which Bollinger was convicted is not unconstitutionally vague as applied to him. The prosecutor made appropriate comments about the evidence during closing argument. Bollinger failed to preserve objections to the introduction of out-of-court statements. We affirm the convictions.