NOT DESIGNATED FOR PUBLICATION

No. 118,790

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of J.S.P.

MEMORANDUM OPINION

Appeal from Wyandotte District Court; DELIA M. YORK, judge. Opinion on remand filed July 31, 2020. Affirmed.

*Michael Duma*, of Duma Law Offices, LLC, of Olathe, for appellant.

*Daniel G. Obermeier, assistant district attorney, Sheri L. Courtney*, assistant district attorney, *Mark A. Dupree Sr.*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before GARDNER, P.J., HILL and SCHROEDER, JJ.

PER CURIAM: In this case, J.S.P. appeals the imposition of his adult prison sentence after the district court found he had violated the terms of conditional release on his juvenile sentence. We previously found that we lacked jurisdiction over this appeal. *In re J.S.P.*, 56 Kan. App. 2d 837, 439 P.3d 344 (2019). The Kansas Supreme Court reversed that decision and remanded the case to the Kansas Court of Appeals. *In re J.P.*, 311 Kan. __, 466 P.3d 454 (2020). We now address J.S.P.'s three arguments: (1) He was denied due process because his conditional release contracts failed to advise him a violation could lead to imposition of his stayed adult sentence; (2) insufficient evidence showed he violated the terms of his conditional release; and (3) imposing his adult sentence constitutes cruel and unusual punishment under both the state and federal Constitutions. Finding no error, we affirm.

1

*Factual and Procedural Background*

J.S.P. pleaded no contest to two counts of criminal discharge of a firearm at an occupied vehicle, two counts of aggravated assault, and one count of aggravated battery. Those crimes occurred when J.S.P was 14 years old. The victim of one of J.S.P.'s crimes was left paralyzed, but the facts of J.S.P.'s underlying crimes are not relevant here.

J.S.P. was sentenced in an extended juvenile jurisdiction proceeding (EJJP). In such a proceeding, a juvenile is given both a juvenile sentence and an adult sentence. The adult sentence is stayed pending successful completion of the juvenile sentence. If the juvenile either violates the terms of his juvenile sentence or commits a new offense, the adult sentence may be imposed in some circumstances. J.S.P. agreed to an aggravated sentence of 72 months in the Kansas Juvenile Correctional Facility (KJCF) in exchange for the State's promise that it would not seek adult prosecution. The district court sentenced J.S.P. to 72 months in KJCF followed by 24 months of conditional release and a stayed adult sentence of 237 months in prison.

When the district court sentenced J.S.P. in 2011, the court, J.S.P.'s attorney, and the prosecuting attorney advised him repeatedly about the adult sentence he could be facing. Defense counsel stated that she had "explained to [J.S.P.] that if he does not follow the juvenile program in KJCF and afterwards that he could serve around 19.75 years as opposed to the six years which we're asking the court to sentence him here today." The prosecutor stated: "If he does comply with all the terms, then he'll never have to serve that EJJP sentence. However, it will be hanging over his head the entire time and could be imposed for something as little as being suspended from school or smoking marijuana."

The court warned J.S.P., saying:

"[V]ery importantly, the law is very strict. A violation of probation—like—like the attorney said, let's say you get out and you're on probation, conditional release, and you skip school, simple as that, smoke marijuana, simple as that. The law says that this court shall revoke your juvenile case and shall order you to go to the adult Department of Corrections. It doesn't say I may, doesn't say I can, it says if there is a violation that's shown, whether it's simple or not, it says the court shall revoke your juvenile sentence and you shall go to the correctional facility. I just want you to know how important it is that this is hanging over your head, and it's a heck of a hammer, okay.

. . . .

". . . In other words, you cannot possess or consume alcohol or drugs. You will have to provide breath tests, blood tests and/or UA's. And as I indicated, a dirty UA is going to have a tremendous effect on what happens to you so make sure it's not.

. . . .

". . . So just to make sure everybody understands, he's facing two different things: One, the one that's applying right now. 72 months minus what he's already been in jail for. That's all he'll have to do as long as he does well and doesn't get in trouble. But if he gets in basically any trouble—it's almost any trouble—he's looking at twice, more than his age, 19 plus years. So for your hope and your sake, and I mean this, I hope you don't. I don't look at anybody age 14 and wish they were going for 19 and three-quarter years, but the court can also—cannot also look away from the crimes involved."

J.S.P. completed his time in KJCF. Just before J.S.P.'s term of conditional release began, he signed three documents acknowledging the conditions of his release and potential consequences for violating them. The first was the Unified Government's Department of Community Corrections Supervision Conditions (UG contract).

That contract notified J.S.P. of the conditions of his release and any potential punishments. Among its required conditions were:

- "obey all laws and . . . report any contacts with law enforcement officers . . . the following working day";

3

- "refrain from the purchase, possession or consumption of drugs (to include 'bath salts' and incense such as 'K-2' and other legally or illegally sold synthetic stimulants) and alcohol and refrain from presence at any location where alcohol and illegal drugs are located";
- "submit to random urine (UA) and breath analysis (BA) tests at the request of [his] probation officer";
- "complete a substance abuse evaluation within 2-4 weeks as directed by [his] probation officer" if J.S.P. tested positive for drugs;
- refrain from possessing or being around weapons or ammunition or those who possess such items; and
- not participate in "any gang-related activity or associate with known gang members."

But this UG contract did not advise J.S.P. that the court could impose the stayed 237-month prison term if he violated his conditional release. Instead, it stated that a non-compliant juvenile could be subject to internal sanctions or could be returned to court on a violation of supervision. It then stated:

> "If a juvenile is returned to Court on a violation of supervision, the Judge may:
> 1. Re-sentence the juvenile to a new disposition (Juvenile Justice Authority Custody, Juvenile Intensive Supervision, or a Commitment to the Juvenile Correctional Facility.)
> 2. Impose one or more of a combination of sanctions such as: house arrest, detention, community service work, extending time on supervision etc."

The UG contract mentioned no other options, such as revoking J.S.P.'s conditional release and imposing his stayed adult sentence.

4

In fact, the UG contract suggested that the consequences for J.S.P.'s violation of the conditions were exclusively those "listed above." Above J.S.P.'s signature on the contract were these warnings:

> **"I understand that if I violate the conditions I may be taken into custody by police** and detained at least until such time as the Court conducts a detention hearing."
> . . . .
> "I ALSO HAVE READ AND UNDERSTAND THE POSSIBLE RANGE OF CONSEQUENCES FOR NOT OBEYING THESE CONDITIONS THAT CAN BE IMPOSED BY MY OFFICER OR BY THE JUDGE AS LISTED ABOVE."

J.S.P. signed two similar documents: (1) a conditional release contract with the State of Kansas Department of Corrections (KDOC contract); and (2) a Juvenile Intensive Supervision Contract with the Johnson County Department of Corrections (JCDC). Both prescribed certain conditions of J.S.P.'s release but neither referred to his stayed adult sentence or explained when it could be imposed. Instead, his KDOC contract stated:

> "Any violation of the Conditional Release Contract is a violation of State Law (K.S.A. 38-2375) and may result in court action to extend the terms of your Release Contract and/or to modify the conditions of your Conditional Release Contract, or to return you to the Juvenile Correctional Facility."

Similarly, his JCDC contract stated:

> "The Respondent may be placed in confinement at the Juvenile Detention Center (or Adult Detention Center if over the age of 18), placed on House Arrest, placed in the Evening Reporting Center (ERC) or directed to appear before the Review Board, if

5

he/she does not comply with the Supervision Contract, Case Supervision Plan, Probation Plan and/or Conditional Release Contract."

J.S.P. began serving his 24-month conditional release in July 2015. One week before his conditional release was to expire, the State moved to revoke J.S.P.'s juvenile sentence and to impose his adult sentence. The State argued that J.S.P. had violated his conditional release by several acts: testing positive for marijuana in November 2015; failing to get a substance abuse treatment evaluation within two to four weeks after his positive test; being in a car on January 7, 2016, with marijuana, firearms, and two known gang members; and failing to notify his probation officer that he had had "negative law enforcement contact."

The State moved to revoke J.S.P.'s conditional release and impose J.S.P.'s adult sentence. The court found cause to execute the adult sentence on the EJJP. J.S.P. then requested and received an evidentiary hearing on the matter. After that April 2016 hearing, the district court found J.S.P. had violated the conditions of his conditional release so it revoked his juvenile sentence and imposed his adult sentence—a 237-month prison term.

J.S.P. appeals the revocation of his juvenile sentence and the imposition of his adult sentence under K.S.A. 2019 Supp. 38-2364. We consolidated his three juvenile cases for purposes of this appeal.

*Were J.S.P.'s Due Process Rights Violated?*

J.S.P. first argues that his due process rights were violated because he was incorrectly informed of the consequences of violating his conditional release.

6

*Lack of preservation*

The State responds that J.S.P. failed to preserve this issue for appeal because he did not argue any due process violation at the trial court level. Issues not raised before the district court generally cannot be raised on appeal. See *State v. Kelly*, 298 Kan. 965, 971, 318 P.3d 987 (2014).

J.S.P. replies that he raised this due process claim by making arguments at his 2016 revocation hearing about "ambiguities and inconsistencies" in his multiple probation contracts. But that characterization of J.S.P.'s argument is broader than the record reflects. J.S.P.'s argument to the district court was a narrow one—that the requirement for him to report negative law enforcement contact was ambiguous if he was not arrested.

> "Judge, yes, thank you. First of all, the probation contracts indicate that clients are—that [probationers] are to report negative law enforcement contact. I've always found that to be ambiguous if a person is not arrested, certainly they could think that wasn't negative. He did report a speeding ticket. He was cited for a speeding ticket and reported that. So if the contract said report any law enforcement contact, that would be one thing, but it says negative law enforcement contact. So it's reasonable to assume that he did not know that that contact was negative since he was not himself arrested."

The State responded that the contracts required J.S.P. to report *any* law enforcement contact, and the court agreed. J.S.P.'s assertion that certain language in his contract was ambiguous did not raise any due process claim to the district court. Constitutional grounds for reversal asserted for the first time on appeal are not properly before the appellate court for review. *State v. Daniel*, 307 Kan. 428, 430, 410 P.3d 877 (2018).

Still, J.S.P. maintains that this issue meets an exception to the general rule requiring preservation. We recognize three exceptions to the general rule that a party

cannot assert a new legal theory for the first time on appeal. See *State v. Phillips*, 299 Kan. 479, 493, 325 P.3d 1095 (2014) (stating exceptions). J.S.P. claims that he meets two of the exceptions that allow this court to consider this issue for the first time on appeal:

(1) The newly asserted theory involves only a question of law arising on proved or admitted facts and is finally determinative of the case, and (2) consideration of the theory is necessary to serve the ends of justice or to prevent denial of fundamental rights.

But J.S.P. simply lists these exceptions to the general rule and does nothing more to explain how they apply here. To accept this scant reference as sufficient would essentially render the preservation rule meaningless. See *State v. Richmond*, 289 Kan. 419, 429-30, 212 P.3d 165 (2009). And Supreme Court Rule 6.02(a)(5) (2020 Kan. S. Ct. R. 34) requires an appellant to explain why we should consider for the first time on appeal an issue not raised earlier. See *State v. Godfrey*, 301 Kan. 1041, 1044, 350 P.3d 1068 (2015). J.S.P. fails to do so.

The Kansas Supreme Court has warned litigants who skirt Rule 6.02(a)(5) "risk a ruling that an issue improperly briefed will be deemed waived or abandoned." *State v. Williams*, 298 Kan. 1075, 1085, 319 P.3d 528 (2014). Our Supreme Court has emphasized that we should strictly enforce Rule 6.02(a)(5) and that failure to follow it could cause abandonment of the claim. See *Godfrey*, 301 Kan. at 1044; *Williams*, 298 Kan. at 1085. In his brief, J.S.P. fails to identify which exception he relies on, nor does he explain how that exception applies to his new argument on appeal. As stated by one federal appellate court, "[a] party may not 'sandbag' his case by presenting one theory to the trial court and then arguing for another on appeal." *McPhail v. Municipality of Culebra*, 598 F.2d 603, 607 (1st Cir. 1979). The district court was not given the opportunity to address J.S.P.'s due process theory.

Appellate courts are not courts of first resort—our role is not to make findings but merely review those made by the district court. See *State v. Thomas*, 288 Kan. 157, 161, 199 P.3d 1265 (2009). J.S.P. got the chance to present his due process argument to the district court; his failure to do so deprived the trial judge of the opportunity to address the issues in the context of this case. That analysis would have benefitted our review.

J.S.P.'s due process claim asserts that because his probation contracts and supervisors did not notify him that a violation could lead to imposition of his adult sentence, he lacked the notice due process requires. But the record also shows that J.S.P. *was* notified of that very consequence multiple times—by the district court at sentencing, by his own attorney at sentencing, and by the prosecutor at sentencing. Nothing in the record suggests that J.S.P. forgot those warnings. And after J.S.P. was released from KJCF and put on conditional release, he was reminded by his permanency plan that prior orders of the court remained in effect. Whether J.S.P.'s probation officers ever told him that a violation could trigger his adult sentence is not in the record on appeal. J.S.P. never asked them that question at the revocation hearing, which would have been the natural time to pursue any claim of lack of notice. So J.S.P.'s due process claim here depends on facts that we don't have. Under these circumstances, we would be unwise to review this unpreserved claim.

"The decision to review an unpreserved claim under an exception is a prudential one. Even if an exception would support a decision to review a new claim, this court has no obligation to do so." See *State v. Gray*, 311 Kan. 164, Syl. ¶ 1, 459 P.3d 165 (2020). We decline to review J.S.P.'s unpreserved due process claim under any potentially applicable exception.

9

*Does Sufficient Evidence Show J.S.P. Violated His Conditional Release?*

J.S.P. next argues that the revocation of his juvenile sentence was not supported by substantial competent evidence. This issue is properly raised for the first time on appeal.

Before imposing the adult sentence in this EJJP, the district court had to find that J.S.P. violated the conditions of his juvenile sentence by a preponderance of the evidence. See K.S.A. 2016 Supp. 38-2364(b). "Because this is a question of fact, this court's review is limited to determining whether substantial competent evidence supports the district court's finding." *In re A.D.T.*, 306 Kan. 545, 550-51, 394 P.3d 1170 (2017). Substantial evidence refers to legal and relevant evidence that a reasonable person could accept as adequate to support a conclusion. *State v. Talkington*, 301 Kan. 453, 461, 345 P.3d 258 (2015).

> "'When sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after reviewing all the evidence in a light most favorable to the prosecution, the appellate court is convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt. Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations.' [Citation omitted.]" *State v. Chandler*, 307 Kan. 657, 668, 414 P.3d 713 (2018).

See *In re J.A.B.*, 31 Kan. App. 2d 1017, 1022, 77 P.3d 156 (2003).

The State's motion to revoke J.S.P.'s juvenile sentence and impose his stayed adult sentence alleged J.S.P. had violated his juvenile sentence by:

(1)     "having negative law enforcement contact and failing to report it to his probation officer within the following workday;"

(2)     "associating with people who were involved in illegal actives;"

(3)     "using illegal drugs and failing to refrain from being at a location where illegal drugs are located;" and

(4)     "failing to get a substance abuse evaluation within the required time."

*Testimony at the revocation hearing*

At the hearing, the State called J.S.P.'s supervising officers Tom Truax and Kelly Neisen, Merriam Police Officer Corey Herron, and Detective Andy Seal to testify. The State also presented evidence showing UA results, a summary of J.S.P.'s lab results, and J.S.P.'s Johnson County probation contract. J.S.P. did not call any witnesses on his behalf and offered only a clinical assessment showing a recommendation for outpatient treatment after J.S.P. failed a UA.

Truax testified about J.S.P.'s behavior while supervising him during his conditional release. Truax was J.S.P.'s supervising officer from July 2015 to November 2015. J.S.P. tested positive for marijuana on November 13, 2015, and the UA results were eventually confirmed. As a result, Truax told J.S.P. that he would have to receive a drug assessment. As a condition of J.S.P.'s supervision, J.S.P. had to notify his supervising officer of any contact with law enforcement, and J.S.P. once reported that he had received a speeding ticket.

In November, Neisen took over as J.S.P.'s supervising officer. She testified about J.S.P.'s behavior up to the date the district court revoked his juvenile sentence and imposed his adult sentence. Neisen told J.S.P. he would need to start drug treatment because of his failed UA on November 13. She spoke with J.S.P. on December 14, 2015, to discuss his required treatment and assessment and J.S.P. obtained the assessment on January 6, 2016. J.S.P. may have tried to get the evaluation a week earlier but was told by

the clinic to return on January 6. She told J.S.P. he would also need to schedule another UA. After that, he admitted to using marijuana once during his conditional release. J.S.P. submitted to another urinalysis (UA) on January 4, 2016, but his results were negative for any drug use. J.S.P. submitted to yet another UA on January 13 and tested positive for marijuana use for a second time.

Neisen met with J.S.P on January 7, 8, 12, and 13, 2016, but J.S.P. never reported that he had any interaction with the police during those meetings or at any other time. Neisen learned of it from a third person. But J.S.P. did tell Neisen that his home life was good, he was looking for work, and he had received a drug and alcohol evaluation.

Officer Herron testified about his interaction with J.S.P. on January 7, 2016. On that date, Herron responded to a traffic complaint that a vehicle had been stopped for some time in a turn lane with its turn signal on. The vehicle had apparently sat through a few cycles of the traffic light. Herron saw that the vehicle was running but could not see into the heavily tinted windows. Herron approached the passenger side of the vehicle and peered through a crack in the window to see that two men were asleep in the front seat and passenger seat and had guns in their laps. Herron also noticed a strong odor of marijuana and so called for back-up officers and medical assistance.

Additional officers arrived. One reached through the window and unlocked the doors. Once the driver's door was opened, they saw J.S.P sitting in the backseat with the driver's three-year-old son. The officers secured the handguns and woke everyone up. They then handcuffed, searched, and placed all the men, including J.S.P., in the back of police patrol cars.

Herron testified that the driver of the vehicle was Oscar Patricio and the front seat passenger was Jesus Carmona. Patricio was holding a fully loaded .45 caliber semiautomatic, Glock handgun. Carmona was holding a loaded .380 semiautomatic,

12

Ruger handgun. The vehicle contained a large amount of marijuana—around 200 grams, empty gallon sized Ziploc baggies with marijuana residue in them, a scale, and rolling papers, some of which were in the back seat. The police also found a gun cleaning kit and a loaded magazine for a .40 caliber, Glock handgun, but did not find the gun itself. J.S.P. did not have a handgun and he was not arrested as a result of the incident.

Seal, a detective for the Kansas City Police Department and Juvenile Unit/Gang Intelligence testified about the January 7 incident and related gang affiliation. In 2009 Patricio admitted to a police officer that he was a member of the gang "F13's." Then in 2010, Patricio was assaulted by a possible rival gang.

The district court took the matter under advisement, then ruled in April 2016 that J.S.P. had violated the conditions of his conditional release. It affirmed imposing his adult sentence, finding the violations we review below.

*Failing to Report Contact with Law Enforcement*

J.S.P. first argues that the use of the term "negative" in the condition requiring him to report contact with the police was unconstitutionally vague so it inadequately warned him of what conduct he needed to report, citing *State v. Bollinger*, 302 Kan. 309, 352 P.3d 1003 (2015). J.S.P. also argues that the word "negative" "opens a door to arbitrary and unreasonable enforcement of the condition." The State, however, shows that although its motion to revoke did allege "negative law enforcement contact," J.S.P.'s conditional release contracts required him to report "any" contact with law enforcement. The district court agreed. Our review of the contracts supports that conclusion, so *Bollinger* does not apply.

J.S.P also generally contends that the district court's decision to revoke his juvenile sentence was not supported by sufficient evidence. At the revocation hearing, the State

presented testimonial evidence that J.S.P. had contact with police officers on January 7, 2016. According to police, J.S.P. was found in a car with two men and one child. The car contained drugs, drug paraphernalia, guns, and ammunition. The driver and passenger of the vehicle were passed out with loaded guns in their laps. The driver was also a known gang member by his own admission. And because of the encounter, J.S.P. was handcuffed, searched, and placed in the back of a patrol car, although he was not arrested.

The State also presented evidence that J.S.P. met with his supervising officer in person on January 8—the very next day—and on January 12, and he spoke to his supervising officer over the phone on January 13. But J.S.P. never reported the January 7 incident to her.

This evidence was sufficient to show that J.S.P. had contact with the police and that he failed to report it. Because his contracts required him to report "any" police contact, this violated the terms of his conditional release, warranting imposition of his adult sentence.

*Associating with People Involved in Illegal Activities and Known Gang Members*

J.S.P. argues that associating with people who are involved in illegal activities and/or who are known gang members could not serve as a basis for revoking his juvenile sentence because the State failed to present evidence that he knew Patricio was a gang member.

True, we find no admission from J.S.P. that he knew Patricio was a gang member. Yet J.S.P.'s knowledge that he was associating with people involved in illegal activity was shown by the circumstances—he was a passenger in a car emitting a strong odor of marijuana, with two acquaintances or friends who were transporting drugs and drug

14

paraphernalia, who were sleeping or passed out while driving, and who were carrying loaded weapons on their laps.

*Using and Being Around Illegal Drugs*

One of J.S.P.'s conditions of release was that he refrain from using or being around illegal drugs. At the revocation hearing, J.S.P.'s two supervising officers testified that J.S.P. tested positive for marijuana use on November 13, 2015, and on January 15, 2016. The district court also admitted the State's exhibit showing those positive results. Although J.S.P. argued that the results stemmed from only one use, that theory was disproven by J.S.P.'s negative test result on an intervening date—January 4, 2016. But even had J.S.P. tested positive only once, that is enough to show he violated the terms of his conditional release. As a result, substantial competent evidence supports the district court's finding that J.S.P. used illegal drugs.

*Failure to Get a Timely Substance Abuse Evaluation*

J.S.P. argues that a failure to receive a timely substance abuse evaluation cannot serve as basis for his revocation because his supervising officers lacked the authority to impose that punishment and getting a drug evaluation was not a stated condition of his release.

We find it unnecessary to decide this issue. The district court's decision to revoke based on any one of the first three violations discussed above is enough to support its finding that J.S.P. violated the terms of his conditional release.

15

*Did Imposing J.S.P.'s Adult Sentence Violate the Eighth Amendment to the United States Constitution or § 9 of the Kansas Constitution Bill of Rights?*

J.S.P. next argues that his adult sentence is unconstitutional because the district court was required to impose his stayed adult sentence without considering both the characteristics of the offender and the offense. J.S.P. also argues that his sentence is unconstitutionally excessive. In making these arguments, J.S.P. cites *Roper v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005) and *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012). The State argues that J.S.P. failed to properly preserve this issue for appeal and that he improperly briefed the issue, so the panel should not reach the merits of his claim.

*Preservation*

J.S.P. contends that he preserved this issue by arguing at his revocation hearing about "ambiguities and inconsistencies" in his multiple probation contracts. We rejected that contention as to J.S.P.'s due process argument, and we reject it in this context as well. J.S.P.'s argument that the term "negative law enforcement" in his contracts is ambiguous does not fairly raise a claim that the imposition of his adult sentence is unconstitutional. That claim was not raised before the district court.

Next, J.S.P. alleges that because this argument is constitutionally based and involves only a question of law arising on proven or admitted facts and determines the case, it meets an exception to the general rule that a party cannot raise a new issue on appeal. J.S.P also claims that consideration of the claim is necessary to serve the ends of justice or to prevent the denial of fundamental rights. But, as before, J.S.P. does not explain why he did not raise this claim earlier, or tell us how it meets the stated exceptions.

16

To the contrary, claims of this type generally cannot be raised for the first time on appeal. The constitutionality of a sentence under § 9 of the Kansas Constitution Bill of Rights turns on the proportionality test set forth in *State v. Freeman*, 223 Kan. 362, 367, 574 P.2d 950 (1978). *State v. Gomez*, 290 Kan. 858, 867, 235 P.3d 1203 (2010) (finding a defendant was not entitled to appellate review of claim raised for first time on direct appeal that sentence was cruel and unusual under Kansas Constitution Bill of Rights). Under this test, the court conducts a three-part analysis that includes both legal and factual inquiries. 290 Kan. at 867. "[A] challenge under § 9 of the Kansas Constitution Bill of Rights generally cannot be raised for the first time on appeal because of the factual inquiries involved." *State v. Dull*, 302 Kan. 32, 38-39, 351 P.3d 641 (2015).

"Disproportionality challenges based on § 9 of the Kansas Constitution Bill of Rights require both legal and factual inquiries. *State v. Patterson*, 311 Kan. 59, 71, 455 P.3d 792 (2020). And a factual record is required for any meaningful appellate review. 311 Kan. at 71 ("'[A] challenge under § 9 of the Kansas Constitution Bill of Rights generally cannot be raised for the first time on appeal because of the factual inquiries involved.'"). We have repeatedly emphasized that it is the defendant's responsibility to ensure the district court makes the factual findings necessary for appellate review. See, e.g., 311 Kan. at 72 (stating that this court has 'repeatedly emphasized' that the defendant bears the responsibility of ensuring that the district court makes adequate factual findings); *State v. Cervantes-Puentes*, 297 Kan. 560, 565, 303 P.3d 258 (2013) (same); *State v. Seward*, 289 Kan. 715, Syl. ¶ 3, 217 P.3d 443 (2009) (same)."*State v. Espinoza*, 311 Kan. 435, 436-37, 462 P.3d 159 (2020).

Good reasons underlie the requirement that a defendant ensure factual findings are made in the district court for this kind of claim:

"There are at least two reasons for a defendant to ensure adequate factual findings are made in the district court to support appellate arguments on case-specific challenges. One is that the court has repeatedly emphasized this is a prerequisite. See *State v. Cervantes-Puentes*, 297 Kan. 560, 565, 303 P.3d 258 (2013) (citing cases). The other is that addressing the issue for the first time on appeal deprives the State of the opportunity to

17

develop a record. *State v. Mondragon*, 289 Kan. 1158, 1163, 220 P.3d 369 (2009)." *State v. Patterson*, 311 Kan. 59, 72, 455 P.3d 792 (2020).

The same is true for J.S.P.'s claim under the Eighth Amendment to the United States Constitution. Constitutional challenges under the Eighth Amendment are divided into two categories: (1) challenges to length-of-term sentences considering the circumstances of a particular case; and (2) categorical proportionality challenges when the defendant claims that a particular punishment is disproportionate for an entire class of offenders. *Graham v. Florida*, 560 U.S. 48, 59-60, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010). J.S.P. argues that the length of his sentence, measured against his conduct and offender characteristics, is excessive punishment or manifest injustice. He thus makes only a case-specific claim. A case-specific challenge requires factual findings, and for the same reasons stated above, is not properly raised for the first time on appeal. See *State v. Reed*, 300 Kan. 494, 514, 332 P.3d 172 (2014) (finding defendant's state and federal constitutional challenges failed for lack of preservation).

We set forth J.S.P.'s argument here. J.S.P. argues that the length of his sentence, measured against his conduct and offender characteristics, is excessive punishment or manifest injustice. He contends his sentence of 237 months is "an excessive sanction and is not graduated and proportioned to the offender and the offense." He relates his three consolidated juvenile charges in December 2010 and April 2011 that led to his sentence, then argues that before those events, he had no criminal history. Yet his "criminal history on each case was determined to be an 'A' because each case enhanced the criminal history category for the other." J.S.P., aged 14, pleaded to all counts and agreed to EJJP prosecution; in exchange, the State did not try to waive him to adult status. Despite J.S.P.'s lack of other criminal history, the court sentenced him to the maximum term under law by ordering all counts in all cases to run consecutive to one another, resulting in a prison term of 237 months.

18

J.S.P. then notes that one of the conditions imposed at sentencing was that he get a drug evaluation and follow its results. This shows, he contends, that the court believed he could benefit from that treatment in the juvenile justice system that was meant to rehabilitate youth, and so his characteristics as an offender may have significantly changed during his 72 months in juvenile custody. Yet the court could not consider any change at the revocation hearing because the law required automatic imposition of his adult sentence. Nor did the court have the power to graduate the sanction in accordance with the behavior that triggered it. Rather, the court was forced to impose the sentence upon any violation, even a technical one. It could not consider the characteristics of the offender or the offense. J.S.P. concludes that his sentence of 237 months is excessive and is not graduated and proportioned to the offender and the offense, so it is cruel and unusual punishment in violation of the Eighth Amendment.

J.S.P. thus does not raise a categorical claim, which generally raises questions of law and may be raised for the first time on appeal in some cases. *Gomez*, 290 Kan. at 866; see *Dull*, 302 Kan. at 39 (addressing categorical proportionality claim for first time on appeal). So his appeal is unlike those in *Roper*, 543 U.S. at 575 (2005) (finding that the Eighth Amendment prohibits death penalty for juveniles); and *Dull*, 302 Kan. at 61 (finding mandatory lifetime postrelease supervision is categorically unconstitutional under Eighth Amendment).

J.S.P.'s case-specific challenges to his sentence under § 9 of the Kansas Constitution Bill of Rights and the Eighth Amendment to the United Sates Constitution are not amenable to appellate review. We decline to review J.S.P.'s unpreserved claim of an unconstitutional sentence under any potentially applicable exception.

Affirmed.